DWS HOLDINGS, INC. *v.* HYDE PARK
ASSOCIATES ET AL.

[No. 234, September Term, 1976.]

*Decided November 10, 1976.*

The cause was argued before THOMPSON, MOYLAN and LOWE, JJ.

*Christopher Sanger* for appellant.

*David A. Sacks* and *Rodney F. Page*, with whom were *Arent, Fox, Kintner, Plotkin & Kahn* on the brief, for appellees.

LOWE, J., delivered the opinion of the Court.

## Prologue

In seeking the top development dollar for its land, appellant, DWS Holdings, Inc., (DES) was compelled to risk losing 10% of its selling price by taking back a note, secured by a deed of trust, for that portion of the price. Because land purchased for development presupposes substantial construction financing, appellant agreed to subordinate its deed of trust lien to the lien of "any Deed of Trust securing a bona fide construction loan. . . ." Anticipating that contingency, appellant sought to minimize its risk by obtaining personal sureties if such a construction loan subordination did take place. Following default on the note by the corporate promisor, DWS brought suit against the personal guarantors. The issue was whether the contingency required to obligate these personal sureties had come to pass. By directing a verdict in favor of the personal guarantors, in the Circuit Court for Montgomery County, Judge Richard B. Latham ruled that the contingency had not occurred.

## Facts

The problem stemmed from a real estate development transaction involving 70 acres of land owned by appellant DWS in Montgomery County. DWS sold that land to Hyde Park Associates, one of the appellees, for residential development purposes. The 70 acre parcel was to be divided in two parts for a three phase development. One parcel was to contain Phase I and the second parcel Phases II-III. Hyde Park's source of financing was BankAmerica Realty Investors (BARI) whose financing agreement with Hyde

Park forms the foundation for the position taken here by DWS.

On January 31, 1973, BARI made its loan to Hyde Park. The loan was to equal 90% of the cost of the land for both parcels, and the entire cost of the construction on Phase I. As shown by the Construction Loan Agreement between BARI and Hyde Park, contemporaneously executed, the land cost allocated to Phase I was $675,000 and the land cost allocated to Phases II-III was $1,825,000, for a total of $2,500,000. Ninety percent of this sum was $2,250,000, which left $250,000 for Hyde Park to pay DWS for land from some source other than the BARI loan. Although cash was originally contemplated for the land cost, it was later agreed that a note for $250,000, secured by a deed of trust from Hyde Park to DWS on the land reserved for Phases II-III, would provide the remaining 10% of land costs.

In accordance with the Construction Loan Agreement, Hyde Park's obligation to BARI was evidenced by two separate notes. BARI note 1, in the amount of $6,585,000, represented 90% of the land cost allocated to Phase I ($607,500) and the balance represented construction costs of Phase I. The second note, BARI note 2, was for $1,640,000, representing 90% of the land cost of Phases II-III. Each note was separately secured by a recorded deed of trust.[1] Each deed of trust conveyed the entire 70 acres to the trustees as security.

The Purchase Agreement between DWS and Hyde Park provided for the payment of the $2,500,000 purchase price by certified check for $2,250,000, and the $250,000 note secured by a deed of trust. DWS agreed to subordinate its deed of trust securing the $250,000 note taken back by it for the 10% balance due on the purchase price of the 70 acres of land, to the deed of trust from Hyde Park, securing a loan not to exceed $1,640,000 from BARI, which was the amount

---

1. The administrative purpose for this bifurcation is apparent from the Construction Loan Agreement which provided for the lender to disburse its funds according to the nature of them. Only the funds which constituted land costs were to be disbursed at time of settlement. That portion of the loan allocated to construction was to be subsequently disbursed only upon the satisfaction of certain conditions not here relevant.

allocated by the Construction Loan Agreement to 90% of the Phase II-III land cost.

When the proposed subordination was submitted to DWS for review, however, it provided for subordination of the lien securing the $250,000 note to both the land loan *and* two construction loans. DWS objected that this was contrary to the agreement in the sales contract, and insisted upon the personal guaranties of the individual appellees [2] if Hyde Park requested subordination to construction loans. It is this provision, required by DWS, upon which appellant relies in trying to collect from the contingent personal guarantors. The crucial paragraph, added by DWS to the deed of trust it took to secure the $250,000 note, was:

> "IT IS HEREBY COVENANTED AND AGREED:
>
> The trustees are hereby authorized and directed, without attaining further consent from the noteholder, and without any additional payment on account of the indebtedness secured hereby, so long as there is no then existing default hereunder, *to subordinate the lien of this Deed of Trust to the lien of any Deed of Trust securing a bona fide construction loan made by an institutional lender* such as a bank, savings and loan association, life insurance company, union pension fund, real estate investment trust, or a similar institution. As a condition to any such subordination, Alan I. Kay, Allen E. Rozansky and Stuart A. Bernstein, and all other General Partners of Hyde Park Associates, A Limited Partnership, shall guarantee the payment of the Note herein secured in accordance with its terms." (emphasis added).

At settlement on January 31, 1973, Hyde Park paid DWS $2,250,000 and gave to them a note for $250,000. The note contained a phrase which, pursuant to the revised contract of sale, provided that there would be no personal liability on the note and that DWS would look solely to the property for

2. Alan I. Kay, Allen E. Rozansky and Stuart A. Bernstein.

satisfaction. The deed of trust securing the note contained the contingent personal liability clause quoted above. The DWS trustees contemporaneously executed a subordination of the deed of trust securing the $250,000 note to the deed of trust securing BARI's note 2. This latter note, in the amount of $1,640,000, appears to have represented 90% of the purchase price of the second portion of land, the construction upon which had been set aside as Phases II-III. Because the deed of trust given in connection with BARI note 2 was cross-collateralized with the deed of trust given in connection with BARI note 1 (which, in turn, represented 90% of the purchase price of the first parcel and the entire construction cost of Phase I), *i.e.*, because *both* deeds of trust described the entire 70 acre tract as security, appellant contends that the personal guarantee clause was triggered. Summarizing its contentions, appellant reasons as follows:

"From this proof it was clearly and uncontrovertibly established:

(1) That under the DWS Deed of Trust, Appellees obligated themselves to personally guarantee payment of the DWS Note in the event that the lien of said DWS Deed of Trust were ever subordinated ' . . . to the lien of any Deed of Trust securing a bona fide construction loan made by an institutional lender such as a . . . real estate investment trust. . . . '

(2) That the DWS Deed of Trust was in fact then subordinated to the $1.64 million BARI Deed of Trust;

(3) That BARI is a real estate investment trust;

(4) That on or subsequent to January 31, 1973, BARI made a bona fide construction loan to HPA, embodied by the aforementioned Construction Loan Agreement between them; and

(5) That the $1.64 million BARI Deed of Trust, to which the DWS Deed of Trust was subordinated, was indeed — by its very terms and those of the Construction Loan Agreement — a 'Deed of Trust

securing a bona fide construction loan' as characterized in the relevant provision of the DWS Deed of Trust. Given the above facts — the existence of which were clearly and manifestly evident from the face of the documentary proof — the lower Court erred in failing to conclude as a matter of law that the obligation of Appellees to personally guarantee payment of the DWS Note had been triggered and brought into full legal effect by virtue of the agreements and writings entered into by the parties or their representatives at the closing on January 31, 1973."

Appellant asks a single question in its appeal from the circuit court's judgment that the event necessary to hold the personal guarantors liable did not occur:

"Did the lower Court err in failing to conclude, *as a matter of law*, that the execution by Trustees for Appellant of a Subordination Agreement dated January 31, 1973 — subordinating the lien of Appellant's Deed of Trust securing its $250,000 Promissory Note to the lien of an otherwise junior Deed of Trust securing obligations of Hyde Park Limited Partnership to BankAmerica Realty Investors — activated Appellees' obligation to personally guarantee payment of the said Promissory Note, where the controlling contractual provisions were clear and unambiguous and where no controversy existed as to any material fact."[3]

## Standard of Review

The emphasis in appellant's question, indicating its reliance upon error "as a matter of law", is presumably prompted by the stringent burden appellants carry when

---

**3.** The case below was tried on interpretive documents and testimony offered by appellant. The "matter of law" issue was not directly decided below, Md. Rule 1085, and may not properly be before us now. Since we do not find the issue to be so clear and unambiguous to constitute a matter of law, we will review the court's judgment on the evidence under the clearly erroneous rule. Md. Rule 1086.

they ask us to set aside a lower court's judgment upon the evidence. Md. Rule 1086. Appellant does not escape that burden, however, by simply designating the question as one of law rather than fact. To become a question of law, the record must clearly show that there is no room for evidentiary interpretation by a fact-finder in light of existing law on the subject at hand.

The "matter of law" upon which appellant relies is the banality prefacing an argument made in nearly every contract construction case before the courts, *i.e.*, that the construction of clear and unambiguous agreements or writings is a matter of law and not of fact. Ensconcing that platitude amid abundant authority, appellant explains more precisely just what it entails, lest we fail to give proper credence to black letter law:

> "The written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite understanding, or unless there is fraud, duress or mutual mistake." *Slice v. Carozza Prop., Inc.*, 215 Md. 357, 368.

The elenchus in appellant's gnome, however, immediately follows the first conjunction in Chief Judge Brune's explanation in *Slice*, *i.e.*,

> ". . . unless the written language is not susceptible of a clear and definite understanding. . . ."

See also C.J.S. *Contracts*, § 294 *et seq*. It is hard to imagine litigants incurring the expense and anguish of a trial and an appeal over the construction of a written document that *is* "susceptible of a clear and definite understanding." But such litigious extravagance does exist (or the judicial eye is more discerning than that of litigants and their counsel), else how explain the relative frequency with which the "clear and unambiguous" platitude is applied and the exception dismissed in our appellate records?

We must discount appellant's contention that the language is so clear and definite that it is entitled to judgment as a matter of law. The amphibolous realities incident to the involved, tripartite financing of this multimillion dollar land development required the court to go beyond the precise provisions of the documents incident to the transaction and seek the intent of the parties. This is especially so since appellant's case below relied exclusively upon evidence it introduced to convince the court of its interpretive intent, the primary source of which was a document to which it was not a party, i.e., the Construction Loan Agreement between BARI and Hyde Park. Indeed, interpretive ambiguity is as much apparent in the nature of the documents relied upon by appellant as from the conflicting language within them.

The $250,000 note upon which appellant relied to establish the initial indebtedness contains the unequivocal statement that:

"It is understood and agreed that there shall be no personal liability on the part of the maker of this Note, or its partners for the repayment of the indebtedness evidenced hereby. . . ."

But that statement is contradicted by the very document securing the loan, the deed of trust which provides for a contingent personal liability. It is therefore evident that these provisions are sufficiently contradictory to be fairly susceptible to different constructions.

Furthermore, it is ironic that appellant evoked language from agreements extraneous to that of the pertinent contracts between the parties, and indeed from one agreement to which it was not a party, to interpret that which it now claims to be "clear and unambiguous". The irony was increased when appellant called upon the only witness below to interpret the "clear and unambiguous" language. Irony borders on amusement when the witness (who was attorney for, and executive vice president of,

DWS) testified that although he insisted upon the inclusion of the contested clause and dictated the language of it,[4]

> "At that date I had been given so little of the documentation respecting the Bankamerica loan and the circumstances immediately — within a month prior to settlement were escalating so rapidly, and the documentation was so voluminous and given so sporadically and amended so frequently, coupled with the representations of the Kay group that my position wasn't changing, that my security wasn't changing, that *I really wasn't able to clearly define what my position would be.*" (emphasis added).

That testimony, submitted by appellant, hardly describes a transaction that is so clear and unambiguous that its provisions operate without regard to the parties' intent, as a matter of law. Accordingly, we are convinced that the question is not a "matter of law". Thus, appellant must convince us that the trial court's judgment was clearly erroneous.

### Intent of the Parties

The cardinal rule in construing contracts is to give effect to the intention of the contracting parties. *Orkin v. Jacobson,* 274 Md. 124, 128-129. The intention of the parties must be divined from all the documents comprising the transaction. See *Rothman v. Silver,* 245 Md. 292, 296; *Ahern v. White,* 39 Md. 409, 416. The most logical manner of seeking this intent is to determine if there was a meeting of minds before the formal contract was executed. In the instant case the record, made solely by appellant, contains the preliminary Purchase Agreement. Although preliminary agreements are merged in the subsequent written contract,

---

**4.** Appellant, otherwise conversant with black letter law, failed to note that where a provision of a contract is of doubtful construction, it will be construed most strongly against the party who prepared it and most favorably to the other party to the contract. See, *e.g.,* New England Mut. Ins. Co. v. Hurst, 174 Md. 596, 604.

*Rafferty v. Butler,* 133 Md. 430, 432, in case of doubt as to the meaning of the written contract, preliminary negotiations and agreements ought to be considered in construing the written contract. See *Stockham v. Stockham,* 32 Md. 196.

Within the Purchase Agreement there is reference not only to the negation of personal liability, but, within the same paragraph, a reference to appellant's consent to subordination. Since subordination of a particular kind is the trigger for personal liability, that clause exudes substantial indicia of intent:

> "(c) At settlement, Purchaser will deliver to Sellers a note from Hyde Park Limited Partnership in the amount of Two Hundred Fifty Thousand Dollars ($250,000). *There will be no personal liability on the note.* The note will bear interest at 6% per annum and will be payable over a five-year period as follows: Interest only for the first two years to be followed by three equal annual installments of principal together with interest. *The note will be secured by a deed of trust* of Section 2 and 3 of the Property as shown on the attached plat of the Property, Exhibit A. *The deed of trust will be subordinate to a deed of trust to be held by Bank of America Realty Services, Inc. covering all of the Property and securing a loan not to exceed the amount of One Million Six Hundred Forty Thousand Dollars ($1,640,000)* or the amount loaned to Purchaser by Bank of America Realty Services, Inc. at the time of settlement, whichever sum is the lesser." (emphasis added).

In spite of the fact that this subordination to BARI's land loan, without any personal liability on the note, was clearly contemplated by DWS as evidenced by the Purchase Agreement, it argues that strict compliance with the contingency clause in the deed of trust securing the $250,000 note compels the liability of the personal guarantors. It reasons thus:

The personal liability was contingent not upon

subordination of the deed of trust securing the $250,000 note to a *construction loan,* but upon subordination of the deed of trust securing that note to *any deed of trust* securing a construction loan. The deed of trust securing the $1,640,000 land purchase loan was expressly linked to the $6,585,000 construction loan for purposes of determining when a default would occur. It further appears that paragraph 16 of the deed of trust securing the $1,640,000 loan provides:

> "16. *Related Loan Documents:* Grantor shall fully and faithfully perform all of the covenants, agreements and obligations on its part to be performed under the Note, Construction Loan Agreement and that certain promissory note of even date herewith from Grantor to Beneficiary in the principal amount of $6,585,000.00 as well as the covenants contained in that certain Deed of Trust securing said promissory note, and upon the occurrence of a default under any of said instruments, then, at the option of the Beneficiary, the entire indebtedness secured hereby shall immediately become due and payable in accordance with paragraph 3 hereof."

The closing portion of the "WHEREAS" clause provides:

> ". . . and also to secure the performance by Grantor of all of its covenants and obligations under this Deed of Trust *and under that certain Construction Loan Agreement of even date herewith by and between Grantor and Beneficiary* (the 'Construction Loan Agreement')." (emphasis added).

According to appellant, this cross-collateralization of the BARI loans provides a lien by deed of trust securing a construction loan to which it had become subordinate, thus triggering the liability of the personal guarantors.

Furthermore, argues appellant, the Construction Loan Agreement between BARI and Hyde Park, executed by them contemporaneously with the other documents at settlement,

considers that notwithstanding the existence of two notes and two deeds of trust, there was only one loan between these parties. The loan is referred to throughout the Construction Loan Agreement as "The Loan", and it expressly states that:

"The execution of separate notes is for purposes of administrative convenience only, and a default under either Note shall constitute a default under the other.",

and that:

"Notwithstanding the execution of separate Notes, the obligations represented thereby shall constitute a single loan."

Appellant's contention totally ignores the purpose of the document between BARI and Hyde Park, the fact that it also called for the allocation of funds between land and construction and most importantly, that DWS was not even a party to that agreement. From it we may glean the intent of Hyde Park, but hardly of DWS. Assuming that the document could cast light upon the interpretation of related documents, appellant asks us to disregard the allocation and give credence only to the cross-collateralization set forth in it. That is contrary to the basic rule of construction that the intention of the parties is gathered from the entire instrument and not from the separate clauses considered individually. *McGaw v. Hanway*, 120 Md. 197, 200.

The DWS argument is designed to convince us that the cross-collateralization by BARI of its deeds of trust caused appellant to be subordinated to the construction loan deed of trust securing the $6,585,000 loan as well as the deed of trust securing the $1,640,000 land cost loan. We do not find that to be its effect. Since the DWS deed of trust was prior to those of BARI,[5] the cross-collateralization of the

---

5. The order of recording stipulated to as being intentionally so recorded was:

1. Deed of Trust securing DWS $250,000 note from Hyde Park.
2. Deed of Trust securing BARI $1,640,000 note from Hyde Park.

subsequent BARI instruments could not preempt the DWS order of lien priority. The only instrument capable of reducing DWS to a subordinate position was the Subordination Agreement executed by DWS trustees.

Surprisingly, neither the parties nor the court sought the extent of the DWS subordination in the Subordination Agreement itself. That document, executed by appellant's trustees, is obviously an integral part of the transaction and should be read together with the other documents constituting the transaction. See *Ahern v. White, supra.* Moreover, since it contains the scope of the subordination to which DWS had agreed in the original Purchase Agreement, it is necessarily the key to the question before us.

The Subordination Agreement recites that as a consideration for lending Hyde Park $1,640,000 BARI had required DWS to subordinate its $250,000 note and deed of trust to BARI's deed of trust

> " . . . in an accumulated amount of principal not to exceed $1,640,000."

That, of course, is *precisely* what DWS had agreed to do in paragraph 2 (c) of the original Purchase Agreement. The Subordination Agreement further states that DWS subordinated its note and deed of trust with the same limitation, *i.e.*:

> " . . . in or to the property described as against said loan to be so made by Lender [BARI] and to any renewals, extensions or modifications thereof, provided that the accumulated amount of principal advanced thereunder shall not exceed the sum of $1,640,000. . . ."

DWS had agreed to look to land for its security and the land to which it agreed to look was to be first encumbered in an amount not to exceed $1,640,000. It is obvious that appellant received precisely that for which it had bargained. *Cf.*

---

3. Subordination Agreement by trustees of deed of trust securing DWS $250,000 note to BARI $1,640,000 note.
4. Deed of trust securing BARI $6,585,000 note from Hyde Park.

*Schapiro v. Jefferson*, 203 Md. 372; *Brownstein v. New York L. Ins. Co.*, 158 Md. 51.

### Sufficiency of Proof

A review of appellant's declaration shows that it did not contend below, as it does here, that it had been subordinated to the $6,585,000 construction loan from BARI to Hyde Park. Rather, it contended that:

> "The said $1,640,000 indebtedness represented a portion of a bona fide construction loan by BankAmerica Realty Investors to HPA, which construction loan is upon information and belief presently in the total principal sum of up to $8,525,000."

If this was the thrust of DWS's suit, as the record seems to indicate, it may not simply assert a contention that the deed of trust it relies upon as its triggering mechanism was a bona fide construction loan. It bears the burden of *proving* that averment. In *Kennedy v. Betts and Clogg, Substitute Trustees*, 33 Md. App. 258 (1976), Chief Judge Gilbert noted that:

> "In our view, when a party who has subordinated his lien for some express purpose to a subsequent lienor seeks to avoid the effect of the subordination agreement on the ground that the purpose of the agreement has been frustrated by the subsequent lienor, it is incumbent upon the prior lienor to prove the *allegata*. He may not simply assert the contention and thereby shift to the subsequent lienor the burden of disproving the averment."

That same reasoning applies when appellant's relief is dependent upon proof of subordination to "a bona fide construction loan".

### Epilogue

However viewed, appellant did not meet its burden of proof. The matter, being less than clear and unambiguous,

was not a matter of law; and the judge's evidentiary judgment, rather than having been clearly erroneous, we think was substantially correct.

*Judgment affirmed.*
*Costs to be paid by appellant.*