DELLA RATTA, INC. *v.* AMERICAN BETTER
COMMUNITY DEVELOPERS, INC.

[No. 30, September Term, 1977.]

*Decided December 7, 1977.*

The cause was argued before MOYLAN, MENCHINE and DAVIDSON, JJ.

*Roy Niedermayer,* with whom was *Joseph V. Gartlan, Jr.,* on the brief, for appellant — cross-appellee.

*Douglas M. Bregman,* with whom were *John C. Joyce* and *Duckett, Orem, Christie & Beckett* on the brief, for appellee — cross-appellant.

MOYLAN, J., delivered the opinion of the Court.

American Better Community Developers, Inc. (ABCD) and Della Ratta, Inc. (Della Ratta) executed a contract dated August 16, 1972, for the construction by Della Ratta of an eight-building, 50-unit garden apartment project in Reston, Virginia. On March 17, 1975, ABCD filed suit in the Circuit Court for Montgomery County against Della Ratta and Maryland Casualty Company, surety on the performance bond, alleging breach of contract by Della Ratta and seeking monetary damages. Della Ratta filed a general issue plea and a counterclaim against ABCD alleging breach of contract by ABCD and seeking damages for lost profits. Upon joint motion, separate trials were ordered on the

issues of liability and damages. Following a two-day non-jury trial in June, 1976, on the liability aspect of the case, the court found in favor of the defendants Della Ratta and Maryland Casualty Company in the suit by ABCD and, likewise, in favor of Della Ratta in its counterclaim against ABCD.

A court trial was then held on December 20, 1976, on the issue of damages sustained by Della Ratta. At the conclusion of Della Ratta's case in chief, ABCD moved to dismiss Della Ratta's counterclaim under Md. Rule 535 on the grounds that Della Ratta had not proved its damages with reasonable certainty. The court granted ABCD's motion and entered judgment on behalf of Della Ratta for nominal damages of one dollar plus costs. This is an appeal by Della Ratta from the judgment awarding it only nominal damages and a cross-appeal by ABCD from the judgment concerning liability.

We will consider first the question of liability. ABCD is a wholly owned subsidiary of American Medical Buildings, Inc. of Milwaukee, Wisconsin. In 1971, it purchased a 2.48 acre tract of land in Reston, Virginia, to construct seven garden apartment buildings consisting of 50 units and a community center building. Upon completion of the project, ABCD planned to sell it to the Fairfax County Redevelopment and Housing Authority to be used by the county for low-income housing. In early 1972, ABCD began extended discussions with Della Ratta for the construction of the project. The terms of the contract were agreed upon between the parties on August 16, 1972, and on or about September 8, 1972, Della Ratta signed a building contract with ABCD.

The terms of the contract provided that Della Ratta would construct the project in accordance with applicable state and federal codes, regulations, ordinances, and laws and in accordance with the agreements, drawings and specifications incorporated into the contract. In consideration thereof, ABCD agreed to pay Della Ratta a lump sum of $740,000. Article XI of the contract provided

that this sum was to be increased by the cost of any extra work or changes agreed to by the parties and that in addition to the cost-of the extra work, Della Ratta would receive an additional 10 per cent as a profit margin. To protect Della Ratta against construction cost increases, the clause "given upon receipt of building permits and" was inserted into Article IV of the building contract before the contract was executed by Della Ratta. Article IV provided in pertinent part:

> "Owner will give Builder 'notice of commencement'. This notification will be given upon receipt of building permits and prior to October 1, 1972. If this notification is not given, Builder may apply for increased costs due to the delay."

On September 14, 1972, ABCD applied to the office of the Building Inspector of Fairfax County for three separate building permits — a permit to construct footings for the apartments and community center, at a projected cost of $20,000; a permit to construct the seven apartment buildings, at a projected cost of $1,000,000; and a permit to construct the community center, at a projected cost of $72,000. On September 15, ABCD was issued a permit to clear and grade the site and construct the footings. James Martin, ABCD's project manager, immediately called Joseph Michael Della Ratta, the president of Della Ratta, Inc., indicating he had gotten the "building permit." Mr. Della Ratta told him that the footings permit was not the "building permits." ABCD, nevertheless, immediately delivered the permit to Della Ratta and by letter of September 18 informed Della Ratta that ABCD would like actual construction to begin after groundbreaking ceremonies on September 26.

Mr. Della Ratta testified that immediately upon receiving the letter from James Martin, he called Mr. Martin expressing surprise at the letter because it was not consistent with the discussions that had occurred on or about September 15. He told Mr. Martin, furthermore, that Della

Ratta did not have the site plans from the engineers which were necessary for Della Ratta to begin clearing nor any notification that preliminary work was done on the site that would permit Della Ratta to start any grading. The scope of on-site improvements, in fact, had not as yet been contractually defined.

Subsequently, on September 26, 1972, an addendum was made to the contract. In consideration of $145,000, Della Ratta agreed to install all on-site improvements. Della Ratta was to be paid $95,000 for the actual work. The remaining $50,000 was the agreed allowance for reimbursement of Della Ratta by ABCD for certain fees imposed by Fairfax County. This amount was to be adjusted upward or downward, based on the actual costs of permits and local utility connection fees. The addendum also provided that if any changes were made in the plans at the request of the owner or in order to secure the approval of local building officials, the contract would be modified according to the procedures outlined for additional work in the contract of August 16, 1972. On the same day that the addendum was made, Della Ratta furnished ABCD with a performance bond from the Maryland Casualty Company.

At the groundbreaking ceremonies on September 26, Mr. Della Ratta walked the site but saw no engineering marks necessary for Della Ratta to start its on-site improvements. The property was staked out, however, on September 29 so that Della Ratta could begin its clearing operations. Della Ratta, nevertheless, did not commence work on the project. It justified its failure to begin the work on the basis that the permit of September 15 was not the "building permits" contemplated by the parties in Article IV of the contract and that the obtaining of the necessary building permits was a condition precedent to its performance.

In early October, 1972, Della Ratta hired Harry Allen Uram to supervise the construction of the Reston project. Mr. Uram determined that the cost of the project in late October would be $798,000 versus the contractual price of $740,000. Extended discussions took place during October up

until mid-November with ABCD and representatives of Fairfax County regarding modification of the plans and specifications in order to reduce costs. The suggestions, however, failed to reduce the costs to the original contract price.

On November 8, 1972, Mr. Della Ratta wrote to James Martin of ABCD advising him that the drawings and specifications as finally approved by HUD and the Fairfax County Housing Authority were not consistent with the preliminary working drawings upon which Della Ratta based its prices. As a result, price increases were being incurred which would affect the contract price. He also wrote:

> "As of this date you do not have final building permits and until they are in hand along with a marked set of prints which will identify any other modifications there might be still other cost implications to consider."

Mr. Della Ratta stated that the masonry, electrical, plumbing, carpentry and lumber costs as reflected in the current design and subcontractor bids were "way out of line" with the contract price. On the basis of the present design, he asked for a minimum addition of $100,000 to the contract price. His letter concluded:

> "We are ready to proceed on the basis of present plans and specifications subject to final building permits and further revisions with an increase in the contract price to $840,000.00 and if you wish to do so that can be done by a simple addendum to the contract. We urge you to act quickly because price increases appear to be a certainty after the first of the year for many materials."

John Lundeen, Vice-President of Construction at ABCD, replied by letter of November 14 to Mr. Della Ratta that the contract price in full for the buildings was $740,000 and that any request for additional cost as a result of subsequent requirements or modifications would have to be handled

under Article XI "Additional work" of the August 16 building contract. He stated that it was ABCD's position that Della Ratta was given proper and timely notice of commencement of work by the letter of September 18 and the delivery of the building permit (footings permit), that this building permit was adequate for commencement of construction, and that any changes in the plans/specifications which had been necessitated would have to be specifically identified with their actual costs so that work orders could be processed pursuant to Article XI. He stated that the letter was to serve notice to Della Ratta that any further delays would be considered breach of contract and that, if work was not begun within 48 hours after receipt of the letter, Della Ratta's employment would be terminated and ABCD would look to the surety for reimbursement of any resulting costs.

On November 21, Mr. Della Ratta responded to Mr. Lundeen that Della Ratta had consistently maintained that the September 18 letter did not constitute a notification of commencement of work because the necessary building permits had not been obtained. He explained that the permit issued by Fairfax County in September was not a building permit but a site plan waiver for footing permits prior to approval of that site plan. He stated that as of the date of the letter — November 21 — Della Ratta had not received the approved site plans or approved building plans. He went on to state that since the final building permits had not been issued, Della Ratta could apply for increased costs and that it had done so in its letter of November 8 when Della Ratta had forwarded to ABCD a breakdown category by category of the costs of the project as they now stood and asked that the contract be modified to reflect the revised price, subject to any further cost increases to be determined after receipt of the building permits and approved plans.

After extensive efforts on the part of ABCD, the building permits for the construction of the seven apartment buildings and the community center were finally approved by the Fairfax County Building Inspector on November 22, 1972, and formally issued on December 4, 1972. On

December 5, ABCD notified Della Ratta and the Maryland Casualty Company that it considered Della Ratta in default and that it would look to the Maryland Casualty Company to cover all loss damages and expenses. The clearing and grading of the property was immediately subcontracted in December to a clearing firm and was completed sometime in January. By letter of February 28, 1973, ABCD notified Della Ratta and the Maryland Casualty Company that it had received bids from four other contractors for the construction of the project and that unless Della Ratta commenced work on or before the close of the work day of March 8, 1973, pursuant to the August 16 building contract and the September 26 addendum, ABCD would enter into a contract with Tri-State Associates, Inc. for the construction of the project and would look to Della Ratta and the Maryland Casualty Company to cover all damages, expenses, and other claims. Subsequently on May 21, 1973, a contract was entered into between Tri-State Associates, Inc. and ABCD. The project was eventually constructed at a cost considerably greater than that agreed to between Della Ratta and ABCD in their contract of August 16 and the addendum thereto.

The critical issue at trial was the interpretation of the words "building permits" in Article IV of the contract. That article provided that ABCD was to give Della Ratta notification of commencement of construction "upon receipt of building permits and prior to October 1, 1972," or Della Ratta could thereafter "apply for increased costs due to the delay." Therefore, whether or not the condition precedent to Della Ratta's performance was met by providing Della Ratta with the footings permit and whether or not Della Ratta breached its contract by failing to commence construction within a reasonable time after receiving the permit hinged on the interpretation of "building permits."

The court determined initially that an ambiguity existed as to the interpretation of the words "building permits." Viewing the testimony and the evidence then in its entirety and considering the intention of the parties, the lower court interpreted "building permits" as "a permit to construct a

building." The court did not feel that the footings permit was the permit intended to trigger the full performance by Della Ratta.

It is ABCD's position that the footings permit delivered to Della Ratta before October 1, 1972, authorizing the clearing and grading of the site and the construction of footings to the first-floor elevation for the apartment buildings and the community center, constituted "sufficient building permits" to meet the condition precedent to Della Ratta's performance. It maintains that Della Ratta breached the contract by failing to commence construction within a reasonable time after receiving the permit. ABCD relies on *Pemberton v. Montgomery County*, 275 Md. 363, 340 A. 2d 240, which held that a "building permit" can be a permit for the construction of a portion of a project such as the foundation or retaining wall and is not limited to a permit for the erection of a building. ABCD urges that since the term "building permit" was defined in *Pemberton* to include a footings permit, the trial court erred, as a matter of law, in failing to apply that definition. What ABCD is, in effect, urging is that there existed no ambiguity as to the interpretation of the words "building permits" and in the construction of the contract and that, applying the definition in *Pemberton*, ABCD performed its condition precedent to Della Ratta's performance.

"To become a question of law, the record must clearly show that there is no room for evidentiary interpretation by a fact-finder in light of existing law on the subject at hand." *DWS Holdings, Inc. v. Hyde Park Associates*, 33 Md. App. 667, 673, 365 A. 2d 554. Stated differently, where the language of a contract, considered in the light of its subject matter, and its object or purpose, is clear and unambiguous, the construction of the contract is a matter of law for the court. *H & R Block, Inc. v. Garland*, 278 Md. 91, 359 A. 2d 130; *Masano v. Albritton*, 245 Md. 423, 226 A. 2d 299; *Jeffrey Sneider-Maryland, Inc. v. LaVay*, 28 Md. App. 229, 345 A. 2d 79. The court, as a matter of law, will then interpret that language according to what a reasonable person in the position of the parties would have thought it meant.

*Billmyre v. Sacred Heart Hospital of the Sisters of Charity,*
273 Md. 638, 331 A. 2d 313; *Orkin v. Jacobson,* 274 Md. 124,
332 A. 2d 901. We do not believe that the words "building
permits" and the provisions of the contract relating to the
condition precedent to Della Ratta's performance were so
clear and unambiguous as to be decided as a matter of law.
The holding in *Pemberton v. Montgomery County, supra,*
which ABCD urges upon us, does not control the situation
here.

In *Pemberton,* the Court of Appeals was called upon to
interpret a provision of the Montgomery County Code which
provides, in pertinent part:

"A decision of the [Montgomery County] board or
the director permitting the erection or alteration of
a building shall be valid for a period of twelve
months, during which time *a building permit* for
such erection or alteration must be obtained and
the erection or alteration started. . . " (Emphasis
supplied) 275 Md. at 366.

In construing that provision, the Court held, at 275 Md.
368-369:

" 'a building permit' does not necessarily translate
into a permit only for a building as such. Indeed, if
a 'building permit' for a swimming pool project, for
instance, were required, the needed permit could be
for the pool itself and not necessarily for a
bathhouse building being erected nearby. And so,
in this case, a 'building permit' allowing
commencement of a service station project can be a
permit for the construction of a portion of that
project such as the foundation or retaining wall and
it is therefore not limited, as the appellant insists,
to a permit for the erection of a building; a gasoline
station is, after all, probably more vitally
comprised of the pumps and the underground
storage tanks.

Furthermore, in the Board's view, 'the retaining
wall was an indispensable part of the support of the

gasoline station building made necessary because the site slopes sharply to the rear of the lot,' and, therefore, the retaining wall permit was part and parcel of the permit for building the station, it being inextricably connected to that erection."

Simply because "a building permit," however, was or can be interpreted as a footings permit, it does not necessarily follow that it must be so interpreted or that parties to a contract so intend when they use those words. A building permit may very well mean a permit to construct a building or an entire structure. The words "building permits," in the plural here, furthermore, were reasonably susceptible to different interpretations. Because a court or legislature has defined a word, term or phrase should not mislead us into thinking that that meaning is the only meaning or that that meaning is unalterable in other situations. 3 *Corbin on Contracts*, § 535, n. 18 (1971 Pocket Parts, pages 7-8), makes this pertinent observation:

> "A 'settled legal meaning.' Does either a legislature or a court have the power (constitutional or divine or physical or dictatorial) to limit or to determine the meaning with which a word must be used by its individual constituents? Without doubt, there have been naive attempts to exercise such a power. It has not yet been held that, in guaranteeing 'freedom of speech and the press', the Bill of Rights denies it. Complex statutory enactments often contain a 'glossary', with definitions of specific words and phrases; but these purport to declare the meanings intended by the legislature with respect to the particular statute, and not to force these meanings into the mouths and pens of individuals or of other legislators."

The trial court was decidedly correct here in considering the circumstances surrounding the making of the contract and other extrinsic evidence in interpreting the language of the contract.

Where the language of a contract is ambiguous or susceptible to different interpretations, the court, as the fact finder, in interpreting that language, will try to ascertain the intention of the parties. In so doing, the court may consider evidence of such extrinsic factors as the negotiations of the parties, the circumstances surrounding execution of the contract, the parties' own construction of the contract and the conduct of the parties. *Canaras v. Lift Truck Services, Inc.*, 272 Md. 337, 322 A. 2d 866; *Foodmaker, Inc. v. Denny*, 32 Md. App. 350, 360 A. 2d 446. The court may also consider the special meaning which trade custom or usage attaches to certain words or terms. 17 Am.Jur.2d, *Contracts*, § 251, states:

> "According to the prevailing view, . . . where trade custom or usage attaches a special meaning to certain words or terms used in any particular trade or business, it is competent for the parties to a contract in which such words and terms are used to show the peculiar meaning of them in the business or trade to which the contract relates, not for the purpose of altering, adding to, or contradicting the contract, but for the purpose of elucidating the language used as a means of enabling the court to interpret the contract language according to the intention of the parties. This rule applies unless there is something to indicate that the parties did not use the language as it is used in the particular trade or business."

See also *Burch v. Prudential Insurance Co. of America*, 184 Md. 664, 42 A. 2d 671.

In interpreting the words "building permits," the trial court relied upon evidence of the ordinary and customary use of those words in the construction industry. In this regard, the court considered 1) the testimony of an independent general contractor, William Bateman, who indicated that by a building permit is ordinarily meant a permit for the construction of the entire structure; 2) a memorandum from Charles Downham, the architect on the

job, dated November 21, 1972, which stated: "General progress: None! The developer advised that he was still unable to obtain his building permit"; 3) a letter from James Martin of ABCD, dated December 19, 1972, to the Fairfax County Housing Authority which stated that the building permit had not been issued until December 4; and 4) a letter from Joseph Bertoni, Chief Building Inspector for Fairfax County, which stated that the footings permit of September 15 "gives permission to pour footings only. Construction above the footings can begin only after a building permit has been issued." From this evidence, the court concluded that "building permits" were intended to mean permits to construct the buildings.

ABCD complains that Mr. Bateman's testimony, in particular, that the words "building permits" in the construction trade did not mean permits to clear, grade and lay footings, erroneously invaded the fact finder's province. Expert testimony will not be admitted to prove to a court or jury the proper or legal construction of any instrument of writing. Where parol or extrinsic evidence is otherwise admissible, however, in construing a contract, expert testimony is admissible to aid the fact finder in interpreting words or phrases in the instrument which have a peculiar meaning in a trade, business or profession. 31 Am.Jur.2d, *Expert and Opinion Evidence,* § 171, p. 736, provides:

> "The principles admitting opinion evidence do not permit a party to a contract to testify as to the effect of the language of the contract as he or she understood it; nor do they permit any other witness to testify as to what is meant by statements in a document prepared by another, unless the words, phrases, or statements used have some unusual or technical meaning peculiar to a certain trade, business, or profession. Thus, expert testimony cannot be received to prove to the court or jury what the proper or legal construction of any instrument of writing is. If, however, words have an unusual meaning or application in a peculiar

> trade, persons familiar with such trade may testify to such meaning and thereby assist the jury or court in interpreting the written or verbal passage in which the words occur. Thus, opinion testimony may be allowed to prove whether certain words indicate that work is to be done, such as 'repairs' or 'reconstruction,' that the word 'tenement,' as formerly used, does not include an elegant modern apartment house, or even that the word 'room' as used in an insurance policy on a factory has a special meaning."

Mr. Bateman's testimony was reasonably calculated to assist the court in interpreting the language of the contract. We see no error in its admission.

In interpreting the words "building permits," the trial court also considered the preliminary negotiations of the parties and the circumstances surrounding the insertion of this language into Article IV of the contract. This evidence amply supports the court's interpretation and belies ABCD's contention that the footings permit satisfied the requirement of "building permits" and was intended to trigger Della Ratta's performance. Mr. Della Ratta testified that before executing the contract, sometime in early September, 1972, the words "given upon receipt of building permits and" were added to Article IV of the contract. He testified that this clause was inserted to protect Della Ratta. The wage-price controls which were then in effect were about to expire. He testified that he indicated to Mr. Martin of ABCD that as the language of Article IV stood, ABCD could tell Della Ratta to build without having the building permits approved by the County and the Housing Authority. As a result, costs would continue to increase during the interim that the building permits were being secured. Mr. Martin, therefore, agreed to the insertion. At the time the clause was inserted into the contract, furthermore, there was no contract for on-site improvements. That contract was not executed until September 26, 1972. It is unreasonable to assume that a footings permit, which of necessity allows the clearing and grading of the site prior to the laying of

footings, was intended by the parties at the time the contract was executed to trigger Della Ratta's performance.

The court, accordingly, gave no significance to the letter from James Martin of ABCD, dated September 18, 1972, to Mr. Della Ratta. The letter referred to the fact that the "building permit" (footings permit) was delivered to Della Ratta on September 15 and that, as per the contract, notice of commencement was as of that date. The letter requested that construction begin on September 26 after groundbreaking ceremonies. Interpreting "building permits" as permits to construct the buildings and taking into consideration that there was no contract for the site work (until the site work was completed, the work in connection with the footings could not be commenced), the court did not consider the letter proper notice of commencement. The court determined that a "building permit" was not issued until December 4 and that since the condition precedent to Della Ratta's performance under Article IV of the contract was not met by October 1, 1972, Della Ratta could not be held in default for nonperformance.

As an alternative argument, ABCD contends that even if the footings permit did not constitute full and complete performance of the condition precedent to Della Ratta's performance, then at least it should be considered a "substantial performance" of its contractual obligation. The substantial performance doctrine is not applicable to the situation here. The supplying to Della Ratta of the "building permits" and notice of commencement before October 1, or it could thereafter apply for cost increases, was an express condition precedent to its performance for the stated contractual price. With regard to such an express condition, 5 *Williston on Contracts* (Third Edition), § 675, p. 184, provides:

> "As a general rule, conditions which are either expressed or implied in fact must be exactly fulfilled or no liability can arise on the promise which such conditions qualify."

134

See also *Metz v. Heflin*, 235 Md. 550, 201 A. 2d 802.

The substantial performance doctrine originates in the area of dependent promises where the performance by one party is a constructive condition precedent to recovery. The doctrine, which is widely applied in building contracts, provides that where a contract is made for an agreed exchange of two performances, one of which is to be rendered first, substantial performance, rather than strict, exact or literal performance, by the first party of the terms of the contract is sufficient to entitle the party to recover on it. The doctrine is thus intended to prevent unjust enrichment. It is intended to prevent the inequity of' one party obtaining the benefit of performance, although not strictly in accordance with the terms of the contract, with no obligation in return. The courts, therefore, will allow recovery under the contract, less allowance for deviations, where a party, in good faith, has substantially performed his obligation. See generally, 3A *Corbin on Contracts*, §§ 700-701; 6 *Williston on Contracts* (Third Edition), § 842; 17 Am.Jur.2d, *Contracts*, §§ 375-379. The Court of Appeals in *Hammaker v. Schleigh*, 157 Md. 652, 668-669, 147 A. 790, stated the principle:

> "In a building contract, when the plaintiff, in good faith, performs all that the contract requires, although not at the time or in the manner required, but substantially as agreed, except in respect to those things which he is prevented from performing through the breach or default of the owner, the plaintiff is entitled, when the owner has received the fruits of plaintiff's work, material, and labor, to recover, since full performance has failed in those things which are not of the essence of the contract, and since otherwise there would be a forfeiture of the plaintiff's beneficial work, labor, and material, to the unjust enrichment of the owner."

See also *Gamble v. Woodlea Construction Co., Inc.*, 246 Md. 260, 264-265, 228 A. 2d 243. The rule was otherwise stated in

*Evergreen Amusement Corp. v. Milstead,* 206 Md. 610, 621, 112 A. 2d 901:

> "As is stated in *H.J. McGrath Co. v. Wisner,* 189 Md. 260, 267: 'It is a general rule that a party who has deliberately and wilfully breached a contract cannot recover thereunder for part performance. See *Williston, Contracts,* Rev. Ed., Secs. 1473, 1474, and note 22 Ill. L.R. 315. However, some courts have allowed recovery on the basis of *quantum meruit* or *quasi* contract.' The hardship of the rule requiring strict performance when applied to a contractor who, in good faith, has substantially performed compared to the inequitable advantage that it gives to an owner who receives and retains the benefit of the contractor's labor and material, has led to a qualification that the contract price, less allowance to the owner for deviations, may be recovered. The question of whether there has been substantial compliance and whether a deviation from contract requirements is wilful or justified, is ordinarily a question for the trier of the facts. *Speed v. Bailey,* 153 Md. 655; *Helmer v. Geis,* 149 Md. 86. In *Speed v. Bailey,* the Court adopted this statement of the rule: ' "When a covenant goes only to a part of the consideration of a contract, is incidental and subordinate to its main purpose, and its breach may be compensated in damages, such a breach does not warrant a rescission of the contract * * *." By this rule, compensation in damages for slight breaches is substituted for the remedy afforded by rescission of the whole contract.' "

The doctrine of substantial performance does not primarily concern itself with the substantial performance of "a condition" but with the substantial performance of an agreed exchange — of one party's obligation under the contract. It concerns itself with preventing a forfeiture for work, labor and materials when there is a substantial performance of that promissory duty in accordance with the

terms of the contract. See *Klingensmith v. Snell Landscape,* 265 Md. 654, 291 A. 2d 56; *Gamble v. Woodlea Construction Co., Inc., supra.* 3A *Corbin on Contracts,* § 701, p. 314, succinctly illustrates the application:

> "... it is not with express conditions or interpretation that we are now primarily concerned. We are now dealing with a contract that consists of two exchanged promises requiring the rendition of two promised performances, without making either promise expressly conditional on anything. The builder promises to build and the owner promises to pay.
>
> . . .
>
> It is substantial performance of what the builder promised to do, of the construction work, of the equivalent for which the owner has promised to pay, that is the 'condition' of the owner's duty to pay. It is not substantial performance of 'a condition' that must be rendered; 'substantial performance' *is* the condition — the fact that must exist before payment is due."

The substantial performance doctrine, therefore, applies to constructive conditions precedent and not to express conditions. Under certain circumstances, however, where there is such a substantial performance of a promissory duty, an express condition qualifying that obligation which has not fully been complied with may sometimes be excused. To prevent a serious forfeiture of labor and materials, the party who has thus substantially performed his obligation may still recover the contract price, less whatever amount may be necessary to compensate the defendant for failure to comply with the condition. See 6 *Williston on Contracts* (Third Edition), § 805. As a general rule, however, an express condition must be fully performed.

Under no circumstances would the substantial performance doctrine apply here. Since the contract was wholly executory, no forfeiture was involved. Full

compliance, therefore, with the express condition precedent was necessary. To hold, furthermore, that the footings permit was a substantial performance of the express condition precedent to Della Ratta's performance and that substantial performance of such a condition is sufficient would be to frustrate the intention of the parties and the clear purpose of the provision in the contract.

The express condition precedent to Della Ratta's performance not having been performed or excused, there was no duty of performance by Della Ratta nor could there have been a breach for nonperformance. See *Laurel Race Course, Inc. v. Regal Construction Co., Inc.*, 274 Md. 142, 333 A. 2d 319; *Griffith v. Scheungrab*, 219 Md. 27, 146 A. 2d 864; *Pradhan v. Maisel*, 26 Md. App. 671, 338 A. 2d 905. Accordingly, the trial court found that Della Ratta's request for increases in costs due to the delay was justified. The court interpreted Della Ratta's letter of November 8 to ABCD as an attempt to resolve increased costs due to inflation and plan changes rather than as an anticipatory repudiation of the contract as ABCD contends. The court further found that after the building permits were issued on December 4 authorizing construction of the entire project, Della Ratta did not receive any notice to commence construction but only a telegram on December 5 telling it that it was in default. The court, as a result, concluded that this communication constituted an unconditional repudiation of the contract by ABCD. See *Harrell v. Sea Colony, Inc.*, 35 Md. App. 300, 370 A. 2d 119.

We feel that the court's construction of the contract was fair, reasonable and practical. The usage of the words "building permits" in the industry, Mr. Della Ratta's purpose in inserting the clause into the contract to protect his company against cost increases, the circumstances which were in existence at the time the contract was executed, and the conduct of the parties until the time Della Ratta asked for the $100,000 price increase amply support the court's interpretation of Article IV. The trial court's findings with respect to resolving the ambiguity in the contract, and its

interpretation based thereon was not clearly erroneous. Md. Rule 1086.

As to the trial on the issue of damages, Della Ratta asserts not only that the court erred in granting ABCD's motion to dismiss but also that the court applied an improper legal standard in doing so. At the conclusion of Della Ratta's case in chief on damages, the court granted ABCD's motion to dismiss under Maryland Rule 535 and entered judgment on behalf of Della Ratta for nominal damages of one dollar. The court prefaced its reasons for granting the motion to dismiss with the following language:

> "The area that we are dealing with here, the question of damages of Della Ratta, Inc., in their capacity as counter-plaintiffs here today, requires them to prove their damages by a fair preponderance of the evidence, and, secondly, doesn't permit me to guess or speculate as to the damages if any that they are entitled to."

Della Ratta complains that in assessing the propriety of granting the motion, the court was obliged to view the evidence presented by Della Ratta and all logical and reasonable inferences deducible therefrom in a light most favorable to Della Ratta. *Hooton v. Kenneth B. Mumaw Plumbing & Heating Company, Inc.*, 271 Md. 565, 571-572, 318 A. 2d 514, 517-518. Della Ratta complains that the trial court instead required Della Ratta to prove its damages "to the court's satisfaction" and that it thus imposed the more stringent standard of review applicable for weighing the evidence in its capacity as the ultimate fact finder.

To recover damages for lost profits, a plaintiff must establish three elements:

> "... (i) ... that a breach by a defendant was the cause of the loss; (ii) ... when the contract was executed, the defendant could have reasonably foreseen that a loss of profits would be a probable result of a breach; and (iii) lost profits ... can be proved with 'certainty.'" *M & R Builders v. Michael*, 215 Md. 340, 345-346, 138 A..2d 350, 353.

The bifurcated trial of the liability issue effectively established that a breach by ABCD and subsequent substitution of Della Ratta as the general contractor prevented Della Ratta from performing under the contract and resulted in the loss of any profits. Foreseeability of the loss can be imputed to ABCD by reason of the fact that ABCD should have known that Della Ratta, as a contractor, entered into the building contract to make a profit. The only real issue, therefore, at the trial on damages was whether or not Della Ratta established with "certainty" a prima facie case of lost profits.

The "certainty" requirement has been modified into the more flexible one of "reasonable certainty." *M & R Builders v. Michael, supra,* states, at 215 Md. 348-349:

> "In such instances, recovery may often be based on opinion evidence, in the legal sense of that term, from which liberal inferences may be drawn. Generally, proof of actual or even estimated costs is all that is required with certainty.
>
> Some of the modifications which have been aimed at avoiding the harsh requirements of the 'certainty' rule include: (a) if the fact of damage is proven with certainty, the extent or the amount thereof may be left to reasonable inference; (b) where a defendant's wrong has caused the difficulty of proving damage, he cannot complain of the resulting uncertainty; (c) mere difficulty in ascertaining the amount of damage is not fatal; (d) mathematical precision in fixing the exact amount is not required; (e) it is sufficient if the best evidence of the damage which is available is produced; and (f) the plaintiff is entitled to recover the value of his contract as measured by the value of his profits."

The measure of damages for direct lost profits is generally the difference between the contract price and the actual or estimated cost of full performance. *Automatic Retailers of America, Inc. v. Evans Cigarette Service Company,* 269 Md.

101, 304 A. 2d 581; *Macke Company v. Pizza of Gaithersburg, Inc.*, 259 Md. 479, 270 A. 2d 645; *Prescon Corporation v. Savoy Construction Company, Inc.*, 259 Md. 52, 267 A. 2d 222; *Petropoulos v. Lubienski,* 220 Md. 293, 152 A. 2d 801; *M & R Builders v. Michael, supra; Hoffman v. Glock t/a Glock Construction Company*, 20 Md. App. 284, 315 A. 2d 551. The total contract price for the entire project and on-site improvements, prior to October 1, was $835,000. Of this amount, $740,000 represented the contractual price for performance of the August 16 building contract and $95,000 was the consideration for on-site improvements provided for in the addendum of September 26. Della Ratta claims that it would have cost it $675,159 to construct the project before October 1 and $74,033 to construct the on-site improvements, for a total performance cost of $749,196. It thus claims that it would have made a profit of $85,804 ($835,000 minus $749,196 equals $85,804).

Della Ratta also established, however, that in late October, its project manager, Harry Uram, determined that the actual cost of performance as of that time would be $798,004 for the project, plus $74,033 for the on-site improvements. The cost of performance thus, as of the end of October, would have been $872,037 versus the prior-to-October 1 total contractual price of $835,000. To show that it would have made a profit, however, rather than a loss from the venture, Della Ratta claims that, after October 1, it was entitled to $100,000 for increases in costs due to inflation and plan modifications made by ABCD and that the $798,004 cost of performance figure took these increased costs into consideration. It thus claims that the total consideration it should have received was $935,000 and that it thus would have realized a profit of $62,963 ($935,000 minus $872,037 equals $62,963).[1] In addition, Della Ratta

1. Della Ratta acknowledges that while, in the computation of net profits, the $100,000 figure increased the cost of performance, it simultaneously increased the contract price. Therefore, it should not have affected the computation of profits. The difference between the net profit before October 1 and the net profit after October 1, when the $100,000 figure is taken into consideration, however, Della Ratta explains, is that the actual increased cost due to inflation and plan modifications was $122,845. Since it only asked for $100,000 from ABCD, however, Della Ratta, therefore, relies on that figure in computing its profits.

claims that its out-of-pocket loss for the salary of the superintendent specifically hired to oversee this project was $4,135. It thus claims a total loss of profits and expenses of $67,094.

Della Ratta's argument, although appearing to have surface validity, has no foundation. To prove entitlement to the $100,000 for cost increases due to inflation and plan changes, Della Ratta would perforce have to establish the validity of the $675,159 figure. The $675,159 Della Ratta claims it would have cost it to perform prior to October 1 to construct the project was not based on any sound evidence. Della Ratta's own project manager testified that, after he was hired by Della Ratta in early October, in computing the cost of performance as of the end of October, he had to start basically from scratch — that there were only a few subcontractor and supplier bids in the file. His testimony indicated that his estimate of the cost of construction as of the end of October was based largely if not completely on new bids. The evidence did not show, therefore, where the costs had increased due to inflation or plan modifications. The evidence did not show that the $100,000 increase in costs was due solely to inflation and design changes by ABCD rather than expenses which Della Ratta would have had to absorb had it commenced construction before October 1 but whose cost had never before been calculated. There was no evidence to show that Della Ratta would have been entitled to the entire $100,000.

In granting ABCD's motion to dismiss, the trial court rendered the following oral opinion:

"The first item briefly that we will talk about is the seven hundred and forty thousand dollar contract figure, and as opposed to the six hundred and seventy-five thousand dollar cost figure that Mr. Della Ratta had indicated as set forth in Defendant's Exhibit Number 12. To allow anything in connection with that would be to allow — or accept the six hundred seventy-five thousand dollar figure as a valid figure that had been proved to the

Court's satisfaction, and as I had mentioned when Mr. Gartlan was going over the first page of his figures there, I didn't think that I could do that because of the lack of proof that we had. The other part of that is that there is absolutely no testimony that the difference between the six hundred seventy-five thousand dollar figure and the seven hundred and forty thousand dollar figure was the anticipated profits that the counter-plaintiff would have made. For that reason the Court is of the opinion that to allow any figure in connection with that first item would be too speculative.

The second item, the one hundred and twenty-two thousand extras, would require an affirmative showing on the part of the plaintiffs that all of these were extras, which the evidence certainly — they would have to affirmatively show these were extras that they were entitled to recover under the building contract of August 16, 1972, and the evidence is lacking in several regards as to a number of those items, and, secondly, here again, there is no indication as to what profit or measure of damages the Court is supposed to allow for that figure.

The concluding area that we are dealing with is the ninety-five thousand dollar figure for the on-site as compared to the seventy-four thousand plus figure which was the figure that is found on the last page of the Defendant's Number 12, which is Category (e). This is the figure that apparently they did have some firm contract bids for, but here again, there are a number of items that there were no contract bids, and we would then be getting into the guesswork or speculative area as to the validity of a number of those particular items. Here again, as in item Number 1, there was no affirmative testimony that the difference between the seventy-four thousand plus figure and the ninety-five thousand dollar figure was the

anticipated profits, and for that reason the Court —
I can't guess or speculate as to that, and could not
award anything.

Accordingly, the Court is going to grant the
plaintiff and cross-defendant's motion in this
matter, and will direct that damages in the amount
of one dollar be entered on behalf of the defendant
and counter-plaintiff Della Ratta, Inc., versus the
plaintiff and counter-defendant American Better
Community Developers, Inc."

It is clear that the trial judge found the evidence highly
speculative and, therefore, awarded Della Ratta only
nominal damages.

To establish damages for lost profits with "reasonable
certainty" does not mean that they must be established in an
exact pecuniary amount. The evidence must, however, lay
some foundation enabling the fact finder to make a fair and
reasonable estimate of the amount of the damage. 22
Am.Jur.2d, *Damages*, § 25, states:

"The rule that uncertainty as to the amount of
the damage will not prevent a recovery does not
mean that there need be no proof of the amount of
the damage. To authorize a recovery of more than
nominal damages, facts must exist and be shown by
the evidence which afford a reasonable basis for
measuring the plaintiff's loss. The damages must
be susceptible of ascertainment in some manner
other than by mere speculation, conjecture, or
surmise and by reference to some fairly definite
standard, such as market value, established
experience, or direct inference from known
circumstances."

Viewing the evidence and all logical and reasonable
inferences deducible therefrom in the light most favorable to
Della Ratta, the evidence here failed to establish, other than
by speculation, that Della Ratta indeed would have made a
profit. Where "all of the plaintiff's evidence ... taken

together, does not rise above speculation, hypothesis and conjecture", a motion to dismiss is proper. *Montgomery Ward & Co. v. McFarland*, 21 Md. App. 501, 515-516, 319 A. 2d 824; *Arshack v. Carl M. Freeman Assoc.*, 260 Md. 269, 272 A. 2d 30.

*Judgments affirmed; costs in the original appeal to be paid by the appellant and costs in the cross-appeal to be paid by the cross-appellant.*