DIALIST COMPANY *v.* DAVID W. PULFORD

[No. 656, September Term, 1978.]

*Decided April 12, 1979.*

174

The cause was argued before THOMPSON, MOORE and MACDANIEL, JJ.

*Jerrold B. Pinsker* and *Stuart R. Blatt* for appellant.

*Eric M. May* for appellee.

THOMPSON, J., delivered the opinion of the Court.

In this case we are concerned with whether or not Judge Ralph G. Shure, sitting in the Circuit Court for Montgomery County, properly used parol evidence to interpret a contract, properly determined that there had been a material breach of the contract, and properly determined the amount of damages.

The Dialist Company (appellant) of Houston, Texas produces a small plastic tray which contains printed advertising of merchants and is designed to slide underneath a telephone so consumers can refer to it when calling merchants. This item is referred to as a "Dialist." In October 1976, the appellant advertised in the *Washington Post* for a "Sales Director." The Sales Director was expected to sell advertising space on the Dialists and arrange for their distribution at business establishments, such as banks, where there existed a high volume of customer traffic.

David Pulford (appellee) replied to the newspaper advertisement, and James Cronin, Vice President of the appellant, came to the Washington area to meet with him and other prospects. In a series of three meetings, Mr. Cronin and Mr. Pulford discussed the product, Mr. Pulford's background in the sale of advertising space, and the way in which the territory of the Baltimore-Washington-Virginia market would be divided. In the second of the meetings, Mr. Cronin told appellee the company was considering two distributorships in this market, but that "the final lines on the map had not been drawn." Mr. Cronin admitted in his testimony that he told appellee that no one would infringe on this territory and no one else would sell in his territory.

The meetings resulted in the execution of a contract on a typewritten form with handwritten terms added at spaces

provided for that purpose. The company granted a distributorship to Mr. Pulford to sell the product and required that he purchase a minimum of 2,000 of the products every month, beginning in February 1977, at a stated price, subject to change on thirty days' notice. The distributor paid the initial sum of $2,500 and agreed to develop the territory to his and the company's advantage. The specific clause in issue reads as follows:

> "2. Company hereby grants to Distributor the distributorship to sell Dialists and the supplies therefor within the following territories to-wit: See Maryland Map 8718, Signed by James R. Cronin and David W. Pulford which is incorporated herein by reference for all purposes." (The underlined portions are handwritten.)

A map was attached showing an outline in pen encircling the District of Columbia and the State of Maryland except for the four southern Maryland counties. In the center of the circled territory, in block capital letters, appear the words "DAVID W. PULFORD TERRITORY."

In reliance on the contract the appellee terminated his employment, sold some stock in order to raise funds, and expended funds in order to begin working on the project.

On January 3, 1977, Mr. Pulford telephoned William Krauser, the other distributor in this area, and learned that both of them had been assigned the territory of the District of Columbia and each considered it his exclusive territory. When Mr. Pulford contacted Mr. Cronin in Houston over the apparent discrepancy, he was informed that the matter would be checked into but he never heard from Mr. Cronin again. He did receive some correspondence from Mr. Herman L. Smith, president of the appellant, exhorting him to sell. The appellee testified that, nevertheless, he began calling on prospective customers in Montgomery County on January 3, 1977. In the ensuing weeks he received commitments from seven businesses for an advertising gross of $531.35. After obtaining five of those advertising commitments, Mr. Pulford wrote to Herman Smith, on January 18, 1977, inquiring about

possible sales tax liability and in another note, of the same date, stated, "I am more than concerned that I have not heard from you since . . . I advised you that my contract was in direct conflict with that of Bill Krauser . . .," adding, "Perhaps you would rather forget the whole thing. If so, please return my $2,500.00 and I will return your samples, etc."

On January 31, 1977, appellee, by letter, demanded rescission of the agreement because a part of his territory had been assigned to Krauser. On February 10, 1977, the appellant company sent a letter to the appellee explaining the sales tax issue and stating that the distributorship agreement was a non-exclusive contract under Texas law [1] and otherwise would be in violation of the Sherman Antitrust Act.[2] Mr. Pulford again on February 17, 1977 and once more on March 2, 1977, demanded that his $2,500.00 be returned. On March 10, 1977, the appellant notified the appellee that his distributorship was terminated for failure to fulfill his monthly sales quota as per the contract. Mr. Pulford testified that he had spent "parts of 5 or 6 days" working in Montgomery County on selling advertising space for Dialist units. Mr. Pulford testified he never made any sales in the District of Columbia, was not aware that any other person sold any Dialists in the District of Columbia and was never told not to sell in the District of Columbia.

Judge Shure, sitting without a jury, held that the intent of the parties was to give the appellee an exclusive distributorship, and as Mr. Pulford was not given what he bargained for he had a right to rescind, which he did either on January 31, 1977, or February 17, 1977, which rescission was accepted by the appellant on March 10, 1977. The court

---

1. Neither party complied with Md. Code, Cts. & Jud. Proc. Art., § 10-504 giving notice of an intention to rely on Texas law. We, therefore, as did the trial judge, apply Maryland law. Frericks v. General Motors Corp., 274 Md. 288, 336 A. 2d 118 (1975).

2. 15 U.S.C. § 1. United States v. Arnold, Schwinn & Co., 388 U. S. 365, 87 S. Ct. 1856, 18 L.Ed.2d 1249 (1967) supports this latter statement, but the case was overruled by Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U. S. 36, 97 S. Ct. 2549, 53 L.Ed.2d 568 (1977).

stated that as the appellee had the right to rescind he was entitled to damages.[3]

## Parol Evidence

The appellant first contends that although it was proper for the trial judge to permit parol testimony as to the alleged fraud it was improper for him to consider such testimony in construing the written contract after he disallowed the count for fraud. Citing *Billmyre v. Sacred Heart Hospital,* 273 Md. 638, 331 A. 2d 313 (1975); *Kermisch v. Savings Bank of Baltimore,* 266 Md. 557, 295 A. 2d 776 (1972); and *Devereux v. Berger,* 253 Md. 264, 269, 252 A. 2d 469 (1969), appellant argues that when the language of a contract is clear the test of what is meant is not what the parties intended it to mean but what a reasonable person in the position of the parties would have thought it meant. This position is correct as far as it goes, but in our view the contract here under consideration was not without ambiguity and, therefore, the court could properly rely on the parol evidence in its interpretation. *See Canaras v. Lift Truck Services,* 272 Md. 337, 322 A. 2d 866 (1974) and *DWS Holdings, Inc. v. Hyde Park Assoc.,* 33 Md. App. 667, 365 A. 2d 554 (1976). We entirely agree with *Mister Filters, Inc. v. Weber*

---

3. In order to avoid confusion we deem it advisable to discuss and clarify this aspect of the lower court's ruling. The record shows that there was no rescission in the technical sense. The rescission of a contract involves voiding it *ab initio* and returning the parties to the *status quo ante.* Ryan v. Brady, 34 Md. App. 41, 366 A. 2d 745 (1976). The usual way in which this is accomplished is through the mutual consent of the parties. Glen Alden Corp. v. Duvall, 240 Md. 405, 215 A. 2d 155 (1965). It involves a voluntary abrogation of the contract and the return of benefits conferred. No such mutual abrogation of the contract took place in this case. Appellant never acquiesced in appellee's demands for the return of his money; appellant's letter of March 10 was not an acceptance of appellee's demand for rescission but rather a purported termination of the contract, according to its terms, for appellee's failure to purchase the required number of Dialists.

Rescission of a contract may also be accomplished through an action brought for that purpose. Ryan v. Brady, *supra.* The present case is an action for damages based upon breach of the contract and no relief in the nature of rescission is sought. We construe this aspect of the court's opinion as meaning that appellee had a right to discontinue further performance of the contract. *See* Glen Alden Corp. v. Duvall, *supra* at 428-31.

*Environmental Systems,* 44 A.D.2d 639, 353 N.Y.S.2d 835, 837 (1974) in which the Court said:

> "[T]he combination of an assigned territory and the failure to specify whether or not it was an exclusive territory render the meaning of the contract unclear and ambiguous. The trial court properly permitted oral testimony of the facts and circumstances surrounding the making of the contract including the prior oral agreements between the parties, and of the representations made by the representatives of the appellant to respondent for the purpose of arriving at the meaning of the terms of the agreement."

## Materiality of the Breach

Appellant argues that any breach of the contract was immaterial because appellee was never prevented from selling in the District of Columbia and no sales were made there by anyone else. Appellee contracted for the exclusive right to distribute appellant's product in Washington, D.C. and most of Maryland. The exclusivity feature of the contract was material because it meant that appellee would be the sole distributor in those areas and any work he did to build up the sales of the Dialist there would redound to his own benefit and not to the benefit of someone else. Where the breach is such that further performance of the contract would be "different in substance from that which was contracted for" it is a material and substantial breach. *Traylor v. Grafton,* 273 Md. 649, 687, 332 A. 2d 651 (1975). We agree with the trial court that the breach was material.

## Damages

The further contention by appellant that appellee suffered no damage by reason of the breach because no one attempted to sell in the District of Columbia is specious. Appellant's repudiation of the contract's exclusivity feature deprived appellee of a substantial benefit of his bargain. The value of

the contract as an exclusive distributorship would be greater than as a non-exclusive distributorship. Appellee, having bargained for an exclusive distributorship, could not reasonably be expected to settle for something less, or to continue with the arrangement once the important feature of exclusivity had been repudiated by appellant. *McKeever v. Washington Heights Realty Corp.,* 183 Md. 216, 220, 37 A. 2d 305 (1944).

Appellant finally contends that if appellee is entitled to recover anything on account of the breach such recovery must be measured under either a theory of restitution or one of damages, but not both. If restitution is the measure, appellant argues, then appellee is entitled to recover only the price paid under the contract. If damages are sought, it is argued, there can be no recovery because proof of the amount of the loss, if any, did not rise above mere speculation. Although there is language in the trial judge's opinion which would suggest that the remedy involved here is one of rescission and restitution, as we explained in note 3, the substance of the lower court's holding, and the pleadings and the evidence all indicate that appellee sought, and was entitled to, relief in the form of damages for breach. *See Glen Alden Corp. v. Duvall,* 240 Md. 405, 428, 215 A. 2d 155 (1965).

Under ordinary circumstances the measure of damages for a breach of contract is that sum which would put plaintiff in as good a position as he would have occupied had the contract been fully performed, subject of course, to the limitations of remoteness and speculativeness. *United States v. Behan,* 110 U. S. 338, 4 S. Ct. 81, 83-4, 28 L. Ed. 168 (1884); *Pennsylvania Threshermen & Farmers' Mutual Casualty Insurance Co. v. Messenger,* 181 Md. 295, 300, 29 A. 2d 653 (1943). Such sum is usually the amount of profit which would have been derived from the agreement had no breach occurred. *M & R Contractors & Builders, Inc. v. Michael,* 215 Md. 340, 351, 138 A. 2d 350 (1958). Where the non-defaulting party has incurred expenses in preparation for, or part performance of, the contract such expenses may also be recovered. *United States v. Behan, supra; Angelozzi v. Nelson,* 156 Md. 558, 563, 144 A. 705 (1929). Cases arise where, for one reason or another,

it is impossible to prove with any reasonable certainty the amount of such expected profits. In that event, the law does not necessarily leave the aggrieved party without remedy. The applicable rule under such circumstances is succinctly stated in 5 Corbin, *Contracts,* § 1031, pages 188-191 (1964):

> "It is often very difficult to estimate the amount of profits that have been prevented by the breach of contract not only because of uncertainty in the happening of various contingencies, but also because of difficulty in determining the money value of a promised performance. or the cost of completion by the plaintiff. There is usually little difficulty, however, in proving what has already been expended by the plaintiff prior to the date of breach by way of preparation and part-performance. The fact that profits are too uncertain for recovery does not prevent a judgment in favor of the plaintiff for the amount of his expenditures. This rule has been recognized and applied many times by the courts; and it has been stated as an alternative measure of recovery by the American Law Institute, with certain limitations. . . ." (Footnotes omitted.)

*See also,* Restatement of Contracts, § 333 (1932).

Closely related to the type of expenditures just discussed, and sometimes includable in an award of damages, are expenditures made in reliance on a contract but not strictly in part performance of it, or as necessary preparation for performance. The nature of such expenses and the propriety of including them in a damage award is explained in 5 Corbin, *supra,* § 1035, pages 207-08:

> "There are many expenditures made in reliance upon an existing contract that can not properly be regarded as having been made in part performance of it, or even as in necessary preparation for such performance. Such expenditures as these are not expected to be compensated directly by the payments or other performance promised by the defendant, for they do not constitute a part of the

agreed exchange. Nevertheless, the net loss involved in such expenditures may be included in the damages awarded, if at the time the contract was made the defendant had reason to foresee that such expenditures would be made and that his own breach would prevent their reimbursement. The expenditures now referred to are collateral to performance of the contract for breach of which the action for damages is brought; and the net losses resulting may readily be regarded as too remote from contemplation and too likely to be the result of other factors to justify their inclusion in the damages for breach. Whenever their inclusion is just, their amount is an addition to the full contract price unpaid — that is, to the full value of the performance promised and not rendered by the defendant. They are included in damages, not because they would have been directly reimbursed by the performance promised by the defendant (or by its 'value' as ordinarily measured), but because the defendant's breach has prevented probable future gains and has rendered determination of their amount impossible." (Footnotes omitted.)

Such expenditures are not brought about by reason of the breach. They are induced by reliance on the contract itself and rendered worthless by its breach. For an excellent discussion of the point see, *In Re Yeager Co.,* 227 F. Supp. 92, 96-97 (N.D. Ohio 1963); 5 Corbin, *supra,* §§ 1031, 1035. The expenditures incurred by a party in preparation for, part performance of, or otherwise in reliance on, a contract are sometimes referred to as the party's reliance interest. On the other hand, the gains which a contracting party expected to reap from the agreement are sometimes referred to as his expectation interest. *See, e.g., In Re Yeager Co., supra.* The award of a party's reliance interest as a measure of damages may serve as an alternative to the ordinary award of his expectation interest. This alternative may be employed when the available evidence relevant to anticipated profits permits no more than a speculative estimate as to their amount.

In some cases it may appear that full performance would have resulted in a net loss. Certainly, in such a case the plaintiff should not be permitted to escape the consequences of a bad bargain by falling back on his reliance interest. Where it can be shown that the plaintiff would have sustained a loss had the contract been fully performed he should not be relieved of the consequences of the agreement by the fortuitous circumstance of the other party's breach. Yet, where the breach has prevented an anticipated gain and, at the same time, made proof of the consequential loss difficult, the burden of proving that performance would have resulted in a loss to plaintiff anyway should be on the party breaching the contract. This principle was ably stated in *Holt v. United Security Life Ins. & Trust Co.,* 76 N.J.L. 585, 72 A. 301, 306 (1909):

> "But where one party repudiates, and thus prevents the other from gaining the contemplated profit, it is not, we think, to be presumed in favor of the wrongdoer (in the absence of evidence) that complete performance of the agreement would not have resulted in at least reimbursing the injured party for his outlay fairly made in part performance of it. Ordinarily, the performance of agreements results in advantage to both parties over and above that with which they part in the course of its performance; otherwise there would soon be an end of contracting. And it seems to us, upon general principles of justice, that, if he who, by repudiation, has prevented performance, asserts that the other party would not even have regained his outlay, the wrongdoer ought at least to be put upon his proof."

The same principle is expressed in Restatement of Contracts, § 333 (d):

> "If full performance would have resulted in a net loss to the plaintiff, the amount of this loss must be deducted, the burden of proof being on the defendant."

Appellant's repudiation of an essential feature of the contract in question deprived appellee of the expectation interest he had bargained for as the exclusive distributor of appellant's product in the District of Columbia and most of Maryland. At the same time, that breach is a major factor in appellee's inability to show with reasonable certainty the amount of profit he would have derived as an exclusive distributor. The early termination of the arrangement left no experience upon which to make a measurement of its profitability, as has long been required by the courts. *St. Paul at Chase Corp. v. Manufacturers Life Insurance Co.,* 262 Md. 192, 244, 278 A. 2d 12, *cert. denied,* 404 U. S. 857, 92 S. Ct. 104, 30 L.Ed.2d 98 (1971); *Winslow Elevator Co. v. Hoffman,* 107 Md. 621, 69 A. 394 (1908). Thus, we have a situation in which any measure of gains prevented on account of the breach would be only speculative. We therefore turn to an examination of appellee's reliance interest to determine what, if anything, he is entitled to recover.

Mr. Pulford testified that from January 1, 1977, to April 28, 1977, he did not work; that his gross income from employment in 1976 was $22,200; and that he obtained free medical insurance from his prior employer valued at $104 per month. Additionally, after selling advertisements for the 5 or 6 days, he expected to sell 4,000 Dialists a month and earn a net profit of $1,600 per thousand Dialists per month as a distributor. In addition to the $2,500 he paid appellant for the distributorship he expended approximately $57.00 in business set-up expenses, $99.52 for a telephone installation and $437.00 for office furniture to be used in his home. He returned to the customers the $531.35 which he had collected from them for Dialist advertisements.

The trial judge awarded: $697.54 for the incidental out-of-pocket expenses, the $2,500 paid by appellee to appellant; $3,700 for two months' salary in the occupation which appellee gave up in order to embark upon the distributorship; $300, which represents the court's finding of the value of medical and dental insurance paid for by appellee's former employer and likewise given up when appellee resigned from his former position.

As appellant does not mount a specific attack against the first or second figures mentioned above,[4] the only sums which require discussion are the last two. The precise question presented by the award of those sums is whether recovery of appellee's reliance interest may include a figure representing salary which was foregone in order to carry out the contract. We note at the outset that while such a loss may in some cases be too remote for recovery there is no such problem here. The evidence is clear that appellant was on notice, expected, and urged the appellee to resign his then current occupation in order to engage full time in the Dialist distributorship. We consider this to be sufficient notice of special circumstances to bring the potential for such loss within the contemplation of the parties.

The authorities discussed above examine a party's reliance interest in terms of out-of-pocket expenditures or outlays made in preparation for, or in part performance of, the contract. These terms imply that the plaintiff in such a case is at least entitled to recover cash or other objects of value with which he has parted. The forfeiture of an occupation in which one earns a steady compensation does not fit neatly within those terms. Nevertheless, we conclude that giving up one's livelihood in reliance on, in preparation for, and performance of, a contractual obligation can be as real a detriment as out-of-pocket expenditures. Under the circumstances of this case, where (1) the detriment was incurred in reliance on the contract; (2) the promisor was aware of, and expected, the promisee's resignation from his former employment; and (3) the value of that which has been given up has been clearly proved; the lost salary is an element of appellee's reliance interest which may be recovered. While no prior Maryland case has addressed this particular point, our holding is not unprecedented. *See Runyan v. Pacific Air*

---

4. The recovery of expenditures in a case such as this may be reduced by the amount of benefits which a party retains as a result of those expenditures. *See* 11 Williston, Contracts, § 1363A (3d. ed. 1968); Restatement of Contracts, *supra,* § 333(c). Here the record shows that a portion of appellee's expenses consisted of the purchase of office furniture. It may well be that appellee was able to salvage some amount upon resale of that furniture or benefit from its use, but the record is silent on this issue. As the appellant has not addressed it, neither shall we.

*Industries, Inc.,* 2 Cal. 3d 304, 85 Cal. Rptr. 138, 466 P. 2d 682, 41 A.L.R.3d 1422 (1970); *Hough v. Jay-Dee Realty and Investment, Inc.,* 401 S.W.2d 545 (Mo. App. 1966); *Shaboub v. De Lacie,* 59 S.W.2d 954 (Tex. Ct. Civ. App. 1933). Each of those cases permitted the recovery of employment compensation foregone by the plaintiff in order to carry out a contract which was later breached by the defendant.

As to damages awarded for the loss of insurance benefits, we conclude that participation in a program of health insurance for which the employer pays may be properly considered a part of an employee's compensation. As such, it may be recovered along with other elements of compensation. The argument that health insurance expenses are too remote to be recoverable is not well taken. It is certainly reasonable to expect that under today's employment practices an employee's compensation package will include such benefits. As we have already said, under the circumstances of this case it was within the contemplation of the parties that appellee would give up his occupation and its attendant compensation in order to carry out his part of the contract.

Expenditures made in reliance on the contract are ordinarily recoverable only when made prior to the non-defaulting party's awareness of the breach. This rule is based on the theory that after a party acquires knowledge of the breach it is no longer reasonable for him to incur such expenses. 5 Corbin, *supra,* § 1031; Restatement of Contracts, §§ 333, Comment a, 336. In this case appellee began work under the contract on the first working day of January, 1977. He became aware of the breach within a matter of days. The trial court awarded reliance damages in the form of lost compensation for a period of two months. We see no abuse of discretion in that award because the relationship between the parties was not dissolved until late February. Until that time it was possible that their differences would be resolved. We note that it was not until March 2, 1977 that appellee refunded the amounts previously received from advertising customers. During this entire period appellant was

186

attempting to persuade appellee to stay with the distributorship.

Finally, we see no error in the court's award of prejudgment interest. This was a matter within the discretion of the judge. *Certain-Teed Products Corp. v. Goslee Roofing and Sheet Metal, Inc.,* 26 Md. App. 452, 339 A. 2d 302, *cert. denied,* 276 Md. 739 (1975).

*Judgment affirmed.*

*Appellant to pay the costs.*