Bertha WATKINS, Ernest Brooks, III, Harold Sachs, Irving S. Hook, Stuart D. Wechsler, United Operating Company, Leonard Barkan, Sam Wietschner, Bernard Lowe, Ruth Rosenbluth, Peter Nemphos and Louis Nemphos, as joint tenants, Harry Lewis, the Martha & Regina Brand Foundation, Inc., Jean C. Osajda, SCB Co., Josephine Freeman, Robert A. Weiss, Louis Klein, Gary Slavik, Allan L. Kovacs, and Gertrude Flacks, Plaintiffs Below, Appellants,

v.

BEATRICE COMPANIES, INC., William W. Granger, Jr., Frank E. Grzelecki, David E. Lipson, Anthony Luiso, William S. Mowry, Richard J. Pigott, Angelo R. Arena, Bernard A. Monaghan, Omer G. Voss, Murray L. Weidenbaum, Alexander Brody, G.A. Costanzo, Walter J. Leonard, Goff Smith, James W. Cozad, Cedric E. Ritchie, William G. Karnes, Jayne B. Spain, Russell Wagner, J.E. Smilow, James L. Dutt, and Kohlberg, Kravis, Roberts & Co., Defendants Below, Appellees.

Supreme Court of Delaware.

Filed: May 23, 1989.

Kevin Gross of Morris, Rosenthal, Monhait & Gross, Wilmington, for appellants.

Robert K. Payson and Donald J. Wolfe, Jr. of Potter, Anderson & Corroon, R. Franklin Balotti of Richards, Layton & Finger, and Craig B. Smith of Lassen, Smith, Katzenstein & Furlow, Wilmington, for appellees.

Before CHRISTIE, C.J., HORSEY and MOORE, JJ.

CHRISTIE, Chief Justice:

This appeal arises from an Order and Final Judgment of the Court of Chancery concerning the administration of the Stipulation and Agreement of Compromise and Settlement (the "Settlement") entered into as a resolution of consolidated stockholder class actions and derivative suits challenging a merger between Beatrice Companies, Inc. ("Beatrice"), a Delaware corporation, and BCI Holdings Corporation ("BCI"), a Delaware corporation. At issue is the management and distribution of the $5 million fund (the "Fund") which the Settlement provided for the benefit of the common stockholders of Beatrice upon consummation of the proposed merger and final approval of the Settlement by the court. The Chancellor declined to rule that the

Settlement became "final" upon his approval and, as a result, he refused to assess interest on the Fund against Beatrice during the appeal process. For reasons discussed more fully below, we hold that the Chancellor's approval of the Settlement, coupled with the actual consummation of the merger, gave rise to an obligation on the part of Beatrice to pay out the Fund under the terms of the Settlement and since that was not done, the stockholders are entitled to interest thereon. Therefore, interest on the Fund should have accrued during the pendency of appeals.

## I.

The underlying action in this case was a consolidation of numerous class and derivative actions brought in the Delaware Court of Chancery on behalf of Beatrice common stockholders.[1] The action challenged the terms of a proposed acquisition of Beatrice orchestrated by Kohlberg, Kravis, Roberts & Co. ("KKR"), and the conduct of certain officers and directors of Beatrice in connection with the transaction. Although this action does not directly involve the history of the transaction, some details pertaining to it are helpful in analyzing the issues currently before the Court.

In the summer of 1985 Beatrice modified its employment agreements with selected senior officers and approximately fifty other executives. This move was apparently in response to rumors circulating in the financial community that Beatrice either was, or was likely to become, the target of a takeover.

On October 16, 1985, a takeover attempt materialized when KKR submitted an offer to acquire Beatrice to Beatrice's Board of Directors (the "Board"). The offer provid-

ed that the shareholders of Beatrice would receive $40 in cash and $5 in market value of preferred stock of the successor corporation for each outstanding share of Beatrice. After consulting with its financial advisors, the Board unanimously rejected the offer as inadequate.

On October 29, 1985, KKR made a second proposal to acquire Beatrice, increasing its offer to $40 in cash and $7 in market value of preferred stock of the successor corporation. In view of the improved offer, and after again consulting with its financial advisors, the Board authorized management to enter into discussions with KKR concerning the revised offer and to explore alternative means of maximizing shareholder value. Acting on this authorization, management asked its financial advisors to determine whether any other parties were interested in acquiring part or all of Beatrice. Contact with approximately 75 potential bidders yielded only one party which expressed an interest in acquiring all of Beatrice. An additional offer was made by that party, which was comprised of the Dart Group Corporation ("Dart") and E.F. Hutton & Company, Inc. ("Hutton"). That group offered $48 cash for each outstanding share of Beatrice.

On November 12, 1985, KKR revised its offer to $43 cash and $7 in market value of preferred stock. This offer was conditioned[2] upon Beatrice granting KKR a cancellation fee and an asset option in connection with the merger agreement.[3] The offer was further conditioned upon Beatrice accepting this bid no later than November 13, 1985.

The Board held a special meeting on November 13 and 14, 1985, to consider the KKR offer. At that time Beatrice's finan-

---

1. Initially nine actions were filed in the Delaware Court of Chancery. In addition seven related actions were filed in Illinois. The Illinois actions were dismissed pursuant to the Settlement. The Delaware actions were consolidated into the present case under a "Unified Consolidated and Amended Complaint".

2. The conditions would apply if another company either acquired 30% of Beatrice's outstanding common stock or made a firm proposal to acquire Beatrice for more than $50 per share.

3. KKR requested $1 per share or approximately $123 million as a cancellation fee and an option to purchase either (i) certain grocery food and Tropicana product subsidiaries for an aggregate purchase price of $2.391 billion or (ii) certain bottled water, processed meats, soft drink, and Tropicana product subsidiaries for an aggregate purchase price of $2.412 billion.

cial advisors expressed the opinion that the KKR offer was fair to Beatrice's stockholders. In addition, on November 13 a Hutton representative informed Beatrice that Hutton and Dart were withdrawing their offer to purchase Beatrice. Thereafter the KKR proposal was the only outstanding offer for Beatrice. After considering the revised KKR offer, the Board decided to accept it.[4] In connection with accepting the offer the Board entered into a merger agreement with BCI, a corporation formed by KKR to operate as the merger vehicle, and also entered into an Asset Option Agreement, which specified the terms of the asset option. The merger agreement provided, *inter alia*, that Beatrice would be prohibited from soliciting alternative proposals.

In response to the Board's actions, various class actions and derivative suits were filed. These suits basically alleged, *inter alia*, that (a) Beatrice's officers and directors, aided and abetted by KKR, had breached their fiduciary duties to the stockholders in entering into the merger agreement and the executive compensation and severance agreements; (b) the termination payment provision was excessive and illegal; and (c) the asset option agreement was invalid. The plaintiffs sought damages and an injunction barring the consummation of the proposed merger and the operation of the termination payment provision and asset option agreement.

After extensive negotiations between the parties an agreement was reached and was memorialized in a memorandum of understanding dated February 2, 1986 (the "Memorandum"). The Memorandum provided for (a) termination of the asset option agreement; (b) reduction of the termination payment provision from approximately $123 million to $18.5 million; (c) revision of the merger agreement to delete the no-shopping provision; (d) confirmation

of Beatrice's right to pay a cash dividend of up to $.45 per share on the common stock and $.845 per share on the preferred stock, to be declared in March; and (e) an increased annual interest rate on the BCI preferred stock from 14% to 15.25% to be paid quarterly (instead of semi-annually). In connection with the Settlement, Beatrice executives agreed to reduce the total executive compensation and severance payments provided under the agreement by $23 million.

On March 11, 1986, the parties entered into the Settlement in accordance with the terms of the Memorandum. In addition to the terms already discussed, the Settlement provided a $5 million Fund to be paid to the common stockholders of Beatrice upon final approval of the Settlement by the court and the consummation of the merger. The Settlement further provided for up to $3.2 million to be paid as plaintiffs' attorneys fees upon final affirmance of the Settlement. The Court of Chancery certified a class consisting of all of Beatrice stockholders at the close of business on February 20, 1986, and ordered a hearing to determine whether the proposed terms were fair and adequate. The shareholders of record were mailed notice of the hearing, which advised them of their right to appeal and object.

Written objections were filed by William Leighton, Joseph Yablonski, and Mr. and Mrs. Kent. The Chancellor approved the Settlement on April 16, 1986. In an opinion issued with his order and final judgment, the Chancellor thoroughly addressed the issues raised by the objectors. The merger between Beatrice and BCI was consummated on April 17, 1986.

Three objectors appealed the Chancellor's decision to this Court, and this Court affirmed the Chancellor's approval of the Settlement.[5] *In re Beatrice Companies,*

---

4. Allegations were made that the Board conferred additional rights upon senior management which would be triggered by a change in control after they were advised that KKR would honor such obligations.

5. The three objectors were William Leighton, and Shirley and Joseph Yablonski. After this Court affirmed the Chancellor's approval of the

Settlement on direct appeal, the Yablonskis did not pursue the matter further. This Court noted that Leighton lacked standing to challenge derivatively the merger, and Leighton conceded that he did not meet class certification criteria. *In re Beatrice Companies, Inc. Litigation,* Del. Supr., 522 A.2d 865 (1987).

*Inc. Litigation*, Del.Supr., 522 A.2d 865 (1987). Leighton, then the lone objector, made a motion to this Court for rehearing. The motion was denied. *Leighton v. Beatrice Companies, Inc.*, Del.Supr., 533 A.2d 1254 (1987). The plaintiffs thereupon sought distribution of the Fund. The Chancellor, having received notice from Leighton that he intended to pursue his rights by applying for *certiorari* in the United States Supreme Court, held that the Settlement was not final until the possibility of review by the Supreme Court had been eliminated by denial of the motion or lapse of time, and therefore, Beatrice was not yet obligated to pay out the Fund.

Leighton sought a writ of *certiorari* in the United States Supreme Court. The writ was denied on October 13, 1987. *Leighton v. Beatrice Companies*, 484 U.S. ——, 108 S.Ct. 233, 98 L.Ed.2d 192 (1987). Leighton's request for a rehearing was denied on November 30, 1987. *Leighton v. Beatrice Companies*, 484 U.S. ——, 108 S.Ct. 474, 98 L.Ed.2d 412 (1987).

After the United States Supreme Court had denied *certiorari* review, the plaintiffs applied to the Chancellor for distribution of the Fund and attorneys' fees because Beatrice continued to refuse to pay these monies, citing the fact that Leighton had moved, pursuant to Court of Chancery Rule 60(b), to set aside the judgment. In his letter opinion dated December 18, 1987, the Chancellor ruled that the Settlement was final.[6] However, the Chancellor declined to order the payment of the Fund and attorneys' fees to the plaintiffs and their attorneys. Instead the Chancellor ordered Beatrice to deposit $5 million for the Fund and $3.2 million for attorneys' fees into an interest bearing account with the Register in Chancery.[7] On September 16, 1988, the Chancellor finally ordered disbursement of the Fund.[8]

The plaintiffs raise two issues on appeal. First, they contend that, under 6 *Del.C.* § 2301(a),[9] interest on the Fund should have been assessed at the legal rate from April 17, 1986, the date when the Settlement took effect after the Chancellor had approved it, as opposed to December 10, 1987, ten days after the United States Supreme Court denied the lone objector's request for a rehearing on the approval of the Settlement. Secondly, the plaintiffs contend that the Chancellor erred in ruling that the costs of any further distribution arising as a result of the present appeal should be borne by the class.

In response, Beatrice contends that plaintiffs did not assert that they had the right to interest from the date of the merger on April 17, 1986, until this appeal, and hence, Beatrice contends that under Supreme Court Rule 8[10] this issue is barred on appeal. Beatrice also contends that the decision to assess interest was within the discretion of the Chancellor. Beatrice argues that since the Chancellor found that no obligation arose to distribute the Fund un-

---

**6.** Noting that a motion under Court of Chancery Rule 60(b) can only be taken if a final judgment or order has been rendered, the Chancellor found that such a collateral attack on the Settlement meant the Settlement was final.

**7.** The Chancellor allowed the class interest at 11% per annum for the thirteen-day period from December 10, 1987, through December 23, 1987.

**8.** Although Leighton's final time for appeal expired on December 10, 1987, the parties were unable to agree as to the form of order. Therefore, a nine month delay ensued, during which the Fund was in an interest bearing account with the Register in Chancery.

**9.** 6 *Del.C.* § 2301(a) provides:
  (a) Any lender may charge and collect from a borrower interest at any rate agreed upon in writing not in excess of 5% over the Federal Reserve discount rate including any surcharge thereon, and judgments entered after May 13, 1980, shall bear interest at the rate in the contract sued upon. Where there is no expressed contract rate, the legal rate of interest shall be 5% over the Federal Reserve discount rate including any surcharge as of the time from which interest is due; provided, that where the time from which interest is due predates April 18, 1980, the legal rate shall remain as it was at such time.

**10.** Supreme Court Rule 8 provides:
  Only questions fairly presented to the trial court may be presented for review; provided, however, that when the interests of justice so require, the Court may consider and determine any question not so presented.

til after the Settlement had been finally affirmed on appeal his refusal to assess interest from an earlier date was correct. Finally, Beatrice contends that the Chancellor acted within his discretion when he allocated the costs of any future distributions to the class.

## II.

The central issue on appeal is the date from which interest should be deemed to have begun to accrue for the benefit of the stockholders. Beatrice contends that the plaintiffs raised their claim (that interest should have begun to accrue in April 1986 after the Chancellor approved the Settlement) for the first time in this appeal. Beatrice claims that in the trial court the plaintiffs merely contended that the obligation to pay interest arose either when the Settlement was finally affirmed on appeal or when the time allowed to take an appeal had expired. Therefore, Beatrice contends that the plaintiffs should not now be permitted to argue in this appeal that interest payment should have started to accrue earlier.

The Supreme Court generally restricts the issues considered on appeal to those which were raised in the trial court. Supr. Ct.R. 8; *Karn v. Doyle*, Del.Supr., 406 A.2d 36 (1979) (*per curiam*). In determining whether an issue has been fairly presented to the trial court, this Court has held that the mere raising of the issue is sufficient to preserve it for appeal. *Sergeson v. Delaware Trust Co.*, Del.Supr., 413 A.2d 880, 881–82 (1980) (*per curiam*). In a case where the trial court noted in passing that it finds an argument unpersuasive, such issue was deemed to have been fairly raised for the purpose of Supreme Court Rule 8. *Id.*

Upon review of the record, this Court finds that the plaintiffs did request that the Chancellor assess interest charges against Beatrice from the date of the Chancellor's decree in prior proceedings. Plaintiffs' counsel, in a letter to the Chancellor dated April 20, 1987, submitted "that Beatrice is

obligated to pay interest on the sum of $5,000,000 due to the class ... from the date of the decree, April 16, 1986." Additionally, in his letter opinion dated April 28, 1987, the Chancellor addressed this argument, although he ruled against the plaintiffs. Thus, as indicated, the issue is found to have been fairly presented to the Chancellor, and it is proper subject of an appeal. Supr.Ct.R. 8; *Sergeson v. Delaware Trust Co.*, 413 A.2d at 882.

## III.

Under some circumstances, this Court has held that "[i]nterest is awarded in Delaware as a matter of right and not of judicial discretion." *Moskowitz v. Mayor & Council of Wilmington*, Del.Supr., 391 A.2d 209, 210 (1978). *See also Metropolitan Mutual Fire Ins. Co. v. Carmen Holding Co.*, Del.Supr., 220 A.2d 778, 781 (1966). Moreover, "[t]he general rule is that interest starts on the date when payment should have been made." *Metropolitan Mutual Fire Ins. Co. v. Carmen Holding Co.*, 220 A.2d at 782. It cannot be disputed that the Fund accumulated some interest while it was in the control of Beatrice and that the corporation was spared some expense by the delay in paying the money into Court. However, the focus of the current dispute is at what date the interest began to accrue for the benefit of those for whom the Fund was created.

A determination of when payment of the Fund should have been made is controlled by the provisions of the Settlement itself. Since the purpose of contract interpretation is to give effect to the express intent of the parties, we begin our analysis of Beatrice's obligation with an examination of the express terms of the Settlement. Interpretation of a contract or a court approved Settlement agreement is not a matter of judicial discretion. The Settlement must be viewed as a binding contract between the parties, even though, after the agreement was approved by the Court of Chancery,[11] administration of the terms of the agreement was in the hands of the court.

11. Approval by the Court of Chancery was necessary to resolve the class action and derivative suits, pursuant to Court of Chancery Rules 23(e) and 23.1, respectively.

The correct interpretation of language in a contract, although "analytically a question of fact, is treated as a question of law both in the trial court and on appeal." *Klair v. Reese*, Del.Supr., 531 A.2d 219, 222 (1987) (citing *Restatement (Second) of Contracts* § 212, comment d (1981); 4 W. Jaeger, *Williston on Contracts* § 616 (3d ed. 1961)). Under the circumstances, this Court may "make its own interpretation of the contractual language, since it is in as good a position as the trial court to do so." *Id.*[12] Because this case turns on the reading of the contract and not on any extrinsic evidence, the proper interpretation of the Settlement is a question of law "subject to independent analysis on appeal." *Id.* at 223.

The correct interpretation of a contract primarily focuses upon the search for the "common meaning of the parties, not a meaning imposed on them by law." *Id.* (citing *Restatement (Second) of Contracts* § 201, comment c (1981)). Furthermore, "in the absence of ambiguity, there is no room for construction." *Nepa v. Marta*, Del.Supr., 415 A.2d 470, 473 (1980). *See also Myers v. Myers*, Del.Supr., 408 A.2d 279, 280 (1979). Hence, the Court will recognize the "plain meaning" of language used in a contract when there is "a generally prevailing meaning and there is no evidence that the parties intended the language to have any other meaning." *Klair v. Reese*, 531 A.2d at 223. In addition, the Court construes the Settlement as a whole, "giving effect to all provisions therein." *E.I. duPont de Nemours & Co., Inc. v. Shell Oil Co.*, Del.Supr., 498 A.2d 1108, 1113 (1985) (*en banc*).

■ With these principles in mind, we review the language of the Settlement.

The key language for the purposes of the resolution of this dispute, appears in the numbered paragraphs 4 and 5 of the Settlement, which discuss the amount of money to be paid to the plaintiffs and the conditions that must be met before the money will be paid. Numbered paragraphs 4 and 5 of the Settlement provide that:

4. Beatrice will pay, in connection with the closing of the [BCI]–Beatrice merger, $5,000,000 to its common stockholders of record at the Effective Time of the merger.

5. The obligations of defendants under this Stipulation are conditioned upon (1) the consummation of the [BCI]–Beatrice merger or an alternative transaction arising from the Solicitation; and (2) final approval of the Settlement by the Court.

The Settlement of the parties defined the term the "Court" as "the Court of Chancery for the State of Delaware in and for New Castle County".

On April 16, 1986, the Court of Chancery issued a memorandum opinion in which the Chancellor approved of the Settlement and signed an Order and Final Judgment,[13] consented to by all the parties and supplied to the Chancellor, dismissing the consolidated action and directing the parties to consummate the Settlement in accordance with its provisions. The merger was consummated the next day, April 17, 1986. Thus on April 17, 1986, both of the pertinent express conditions contained in the Settlement had been fulfilled, and Beatrice's obligation to disburse the Fund to the common stockholders arose. Therefore, under the terms of the Settlement, the plaintiffs were entitled to interest on the Fund at a rate determined under 6 *Del.C.* § 2301(a) as of that date.

---

**12.** When interpretation of a contract requires "findings of fact concerning evidence beyond the four corners of the contract ('extrinsic evidence') or on inferences drawn from those findings" this Court will generally defer to the trial court's interpretation. *Klair v. Reese*, 531 A.2d at 222. However, this Court is not bound by the findings of the trial judge if they are not sufficiently supported by the record and the product of an orderly and logical deductive process. *Id.; see also Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972).

**13.** Numbered paragraph 9 of the Settlement provided that:

9. If the Settlement ... and all transactions referred to therein and preparatory or incident thereto, and all such transactions taken as a whole, shall be approved by the Court following a hearing, the parties shall jointly request the Court to enter an Order and Final Judgment....

Beatrice argued before this Court, as it had before the Chancellor, that the parties intended that Beatrice did not have any obligation to pay the Fund until the Settlement was "finally approved" on appeal. In support of its position Beatrice refers the Court to the other terms in the Settlement, specifically the provision for attorneys' fees, which, in contrast to the provision for the Fund, explicitly mention the contingency of an appeal.

Recourse to other sections of the Settlement which explicitly discuss the possibility of an appeal only serves to underscore the fact that the section of the Settlement dealing with payment of the Fund does not contain any language as to appeals. For example, numbered paragraph 10 of the Settlement, which deals with the payment of the plaintiffs' attorneys' fees, provides that:

10. If the terms of this Stipulation shall be approved by the Court and if any party to this proceeding shall not otherwise exercise a right to withdraw from this Stipulation under the terms set forth herein, all plaintiffs' attorneys in the Action will jointly apply to the Court for an award of attorneys' fees.... Any attorneys' fees and expenses so awarded by the Court to the plaintiffs' attorneys shall not be payable unless and until the. Order and Final Judgment ... shall be finally affirmed on appeal or by lapse of time or otherwise, shall not be subject to appeal....

The Settlement thus provides that the plaintiffs' attorneys can apply to the Court for an award of attorneys' fees once "the terms of this Stipulation shall be approved by the Court". The Settlement language treats the approval of the Settlement by the Court of Chancery as a separate temporal event from the Settlement's final approval on appeal. Thus, although the Settlement provides that the Court of Chancery may award attorneys' fees when it approves the Settlement,[14] the Settlement explicitly states that the attorneys' fees "shall not be payable unless and until the

Order and Final Judgment shall be finally affirmed on appeal or ... shall not be subject to appeal." The language of this paragraph, with its explicit reference to a possible appeal, merely emphasizes that the drafters of the Settlement acted purposefully when they included language dealing with an appeal. The lack of corresponding explicit language in the earlier section dealing with the payment date of the Fund cannot be fairly understood, as Beatrice contends, as an implicit inclusion of the explicit language missing in the pertinent section and carefully placed in the later section. Instead, this argument reinforces the conclusion that the drafters of the Settlement did not intend for the language concerning the time of payment for the Fund to include the time on appeal.

A similar instance of explicit language to this effect occurs in numbered paragraph 11 of the Settlement, which provides that "any party shall have the option to withdraw from the Settlement" if, *inter alia*, "the Settlement is not approved by the Court or on appeal". This language explicitly considers that approval by the Court of Chancery and approval on appeal constitute two separate events. The parties had the ability to premise the obligation to disburse the Fund on affirmance on appeal of the Settlement, as they did with these other provisions, but they did not do so. Their failure to do so must be read as an indication that they meant to do what they explicitly provided for in the language concerning that event—pay the Fund upon fulfillment of the stated conditions. Affirmation on appeal of the approval of the Settlement by the Court of Chancery was not a condition to the disbursement of the Fund. The only two stated conditions were fulfilled on April 17, 1986, and thus Beatrice became obligated to pay the Fund on that date.

We conclude that as a matter of law, the Court of Chancery erred by not assessing interest costs against Beatrice beginning when the two conditions expressly provided for in the Settlement were met on April 17, 1987.

---

14. In fact the Court of Chancery awarded $3.2 million in plaintiffs attorneys' fees in its Order and Final Judgment, dated April 16, 1987, in which it also approved the Settlement.

## IV.

Beatrice also attacks the plaintiffs' claim to interest under 6 *Del.C.* § 2301(a). Beatrice contends that since the parties did not provide for interest on the Fund the plaintiffs are barred from asserting a claim to interest. This contention is without merit.

Delaware law provides that if a contract is silent as to an interest rate, interest must nonetheless be paid. 6 *Del.C.* § 2301(a) provides that, "[w]here there is no expressed contract rate, the legal rate of interest shall be 5% over the Federal Reserve discount rate...." The plaintiffs correctly referred to 6 *Del.C.* § 2301(a) in order to calculate interest. In their calculation under this provision, they assert that the proper rate of interest is 11.5%—or 5% over the federal reserve rate of 6.5% as of November 1988—for a total of $958,333. However, the proper date for the rate of interest to be determined is April 17, 1986, the date both of the conditions precedent to Beatrice's obligation had been fulfilled thereby giving rise to the stockholders' right to collect the Fund. 6 *Del.C.* § 2301(a). The "rate of interest shall be 5% over the Federal Reserve discount rate" as of April 17, 1986. 6 *Del.C.* § 2301(a); *State ex rel. Secretary of Dept. of Transp. v. Penn. Cent. Corp.*, Del.Supr., 520 A.2d 670 (1986), *aff'g* Del.Super., 511 A.2d 382; *Rollins Envtl. Services, Inc. v. WSMW Indus., Inc.*, Del.Super., 426 A.2d 1363, 1367–68 (1980).

## V.

The parties are in further disagreement as to which party is required to bear the cost of the distribution of the additional interest to Beatrice's common stockholders. The Chancellor touched on this issue in his letter opinion, dated August 29, 1988, but in view of his ruling that no further distribution of interest would be necessary, his discussion of this point is *dicta*. Under the circumstances, this Court will decide this issue *de novo*.

The Settlement provided that Beatrice would pay for the original distribution. Although Beatrice sought to delay this distribution until this Court had heard the plaintiffs' appeal, so that regardless of the result no second distribution would be necessary, Beatrice is also the party which chose to contest the payment of the Fund when it was requested. Moreover, Beatrice is the party which chose to enter into the merger agreement giving rise to the litigation, and it is the party which owes the payment. For these reasons we hold that between the parties it is more equitable that Beatrice bear the cost of this second distribution.

We, therefore, REVERSE the Chancellor's decision and REMAND this action for disposition in accordance with this opinion.