In the Matter of GEC INDUSTRIES, INC., f/k/a Gates Engineering Co., Inc., Debtor.

GATES ENGINEERING CO., INC., Plaintiff,

v.

STANDARD ROOFING, INC., Defendant.

Bankruptcy No. 89–44.
Adv. No. 89–11.

United States Bankruptcy Court, D. Delaware.

Feb. 5, 1991.

David W. O'Connor, Wilmington, Del., for debtor/plaintiff.

David S. Shamers, Wilmington, Del., for defendant.

## MEMORANDUM OPINION AND ORDER

HELEN S. BALICK, Bankruptcy Judge.

This is a breach of contract action. Gates Engineering Co., Inc. sued Standard Roofing, Inc. to recover $68,674.09 for roofing materials Standard received but for which it did not pay. Standard denies liability, claiming that inventory it still possesses should be credited against monies it owes Gates. Standard also counterclaims against Gates for breach of contract and tortious interference with its contractual relationships with customers. Standard seeks compensatory and punitive damages and attorney's fees.

### I. Facts

#### A. *The Business Agreement*

Gates manufactures roofing materials, including EPDM and Hypalon. EPDM and Hypalon are forms of rubber sheet roofing membrane. Gates' main office is located in Wilmington, Delaware.

Standard is a New Jersey corporation whose primary business is the wholesale distribution of roofing materials and supplies to contractors. Standard has four branch offices in New Jersey and one in York, Pennsylvania. In 1983, Standard and Gates entered into a business relationship that, until July 1986, was governed solely by an oral understanding. Standard purchased Gates' roofing material, neoprene and EPDM, at a wholesale rate, and then sold these materials to contractors and other retail sellers.

There are two grades of roofing materials that are used in the roofing business, firsts and seconds. Seconds are generally older, are of a lower quality, and are less expensive than firsts. Firsts have limited time during which their quality remains at a certain level. This duration is known as their "shelf life". Standard's oral agreement with Gates did not allow it to sell Gates' materials that were seconds.

On July 29, 1986, Gates and Standard executed a written distributor agreement (contract). The contract appointed Standard as "an Independent Distributor" of Gates to promote and sell System I EPDM and System III Hypalon. The contract also designated the geographical territories where Standard was authorized to sell these products and provided that either party could terminate upon 30 days notice.

Gates suggested the idea of the written contract to Standard to conform to its overall business practice. Neither party intended the contract to change the prior oral understanding.

From 1983 to 1988, Standard inventoried and sold a substantial amount of Gates' products. Several years these sales were over one million dollars. Most of these sales were within the territory designated in the contract. On two occasions, however, Standard sold Gates' products to contractors for use on Long Island, New York, outside the contract territory. Gates approved of these sales. Standard also inventoried and sold roofing materials of other manufacturers. Specifically, Standard sold EPDM products of Celotex, Koppers Company, and Johns Manville that directly competed in the marketplace with Gates' EPDM. Standard's annual profits, however, derived primarily from the sale of Gates' products.

Gates had approximately 50 distributors throughout the country that it worked with to sell its roofing products. Several of these distributors had territories overlapping the territory of Standard. In several instances, Gates sold its products directly to contractors.

#### B. *The Agreement Terminates*

In May 1988, Matt Bowen, regional sales manager for Gates, informally told Peter J.

McKelvogue, a manager for Standard, that the contract was going to be terminated because of poor sales. At that time, McKelvogue gave Bowen a list of Standard's inventory of Gates' products totalling about $130,000. Bowen examined the inventory and soon after, Gates offered Standard $17,000 in exchange for the return of this inventory. Standard did not accept this offer. Instead, with Bowen's active assistance, Standard reduced the inventory through sales to a level of about $70,000. In June 1988, McKelvogue wrote to Alan S. Clapperton, Jr., chief executive officer of Gates, to ask about the return to Gates of unsold inventory.

Sometime during the summer of 1988[1] Gates sent Standard written notice of termination that became effective August 12, 1988. At Gates' request, Standard moved all its remaining inventory to its Tinton Falls, New Jersey warehouse. In October 1988, Bowen inspected the inventory and discovered that some of the inventory's shelf life had expired, and also that some of the inventory were seconds. Gates refused to accept any of the inventory.

II. The Merits of Gates' Claim

Gates' claim arises from roofing materials Standard ordered and received at various times but for which it never paid. The materials for which Standard did not pay are *not* the same materials that Standard had remaining as inventory when the contract terminated. Rather, some of the materials for which Standard did not pay were sold to and used by roofing contractors. The aggregate value of these unpaid for materials at the respective times they were shipped to Standard was $60,408.61. Gates also seeks $8,265.48 in service charges pursuant to a 1½% per month formula it argues was part of the parties' business agreement. Thus, Gates' total claim in its complaint is $68,674.09.

In defense, Standard argues that it should have been able to return its remaining Gates' inventory for a full credit. Standard alleges the value of the inventory

is $69,498.12, which more than offsets Gates' claim.

A. *Standard Should Not Receive an Offset for Unreturned Inventory*

■ The contract did not provide for the return of goods. Standard argues, however, that the course of performance with respect to return of inventory establishes that the parties contemplated Standard would always be able to return inventory. *See* 6 *Del.C.* § 2–209(3). This argument fails.

Trial testimony established that Gates had the discretion not to accept inventory, after consideration of factors such as condition, shelf life and merchantability of the inventory. From 1983 onwards, this discretion was exercised on a regular basis to refuse the return of inventory Standard proffered.

Standard also argues that the usage of trade in the roofing industry should allow it to return the inventory. 6 *Del.C.* § 1–205. Standard did not show by a preponderance of the evidence that such a usage of trade existed. Standard itself had a return policy with respect to *its* customers that allowed it to refuse returns based on factors similar to those Gates employed.

■ Standard's final argument is that Gates breached its implied covenant of good faith in performance of the contract. 6 *Del.C.* § 1–203. Standard has the burden to show a breach of the covenant of good faith. *Coca–Cola Bottling Co. of Elizabethtown v. Coca–Cola Co.*, 668 F.Supp. 906, 918 (D.Del.1987). Standard points to the contract provision that requires it to "maintain an inventory of Gates Engineering materials." Standard argues that Gates' conduct was responsible for unsaleability of some of the inventory in October 1988.

This contention is rejected. (*See* Section I.B. *supra*). Standard had more than ample notice of the termination of the contract. Gates made a timely offer for the

---

1. While trial testimony indicated several letters existed pertaining to both the inventory and termination matters, neither counsel chose to introduce them into evidence. This hinders the court's ability to pinpoint precise dates.

return of the inventory. When Standard rejected this offer, Gates worked with Standard to sell off some of the inventory. In addition, some of the inventory was more than a year beyond its shelf life. In light of the established practice of refusing the return of unsaleable inventory, it was reasonable for Gates to refuse the remaining inventory in October 1988.

Standard also relies upon the fact that Gates sold seconds to Geyer Roofing, a customer of Standard. Standard suggests this impeded its effort to reduce inventory. Standard's contract with Gates related only to firsts. Thus, the sale of seconds to Geyer is not evidence of a breach of duty of good faith. *Hancock Paper Co. v. Champion Int'l*, 424 F.Supp. 285, 290 (E.D. Pa.1976). Gates did not breach its covenant of good faith.

### B. *Gates Cannot Claim a Service Charge*

■ Gates asserts that in addition to the price of the goods it shipped to Standard, it can charge Standard interest on the unpaid balance at the rate of 1½% per month, or 18% per year. This service charge policy was not part of the contract, nor does Gates point to any evidence of a course of performance effectively adopting this service charge policy. Gates relies upon invoices and monthly bills upon which Gates printed its service charge policy. Gates offers no legal argument or case law, however, to explain how this unilateral action by Gates translates into a contract term about which there was a meeting of the minds. Thus, Gates cannot recover interest on the unpaid balances pursuant to its 1½% per month service charge policy.

### C. *Gates May Claim Interest*

■ Gates alternatively argues that it is entitled to interest as an element of contract damages. This proposition is correct. *F.E. Myers Co. v. Pipe Maintenance Services*, 599 F.Supp. 697, 704 (D.Del.1984). Gates is entitled to prejudgment interest from the date when Standard's payment for specific merchandise became past due through the date of judgment. *Watkins v.*

*Beatrice Companies*, 560 A.2d 1016, 1020 (Del.Supr.1989). The applicable rate of interest is determined by 6 *Del.C.* § 2301(a). 560 A.2d at 1022–23. If Gates cannot provide the evidence necessary to properly compute prejudgment interest, however, the court has the discretion to award prejudgment interest from the date of the complaint. 599 F.Supp. at 705.

According to Gates' invoices, the date interest becomes due is 30 days past the invoice date for a specific payment. Gates' damages here flow from multiple payments which became due on different dates spanning many months. *See American Original Corp. v. Legend, Inc.*, 689 F.Supp. 372, 383 n. 5 (D.Del.1988). Proper calculation of the aggregate amount of interest requires Gates to determine:

1. For each component of the unpaid balance, the date from which Gates is entitled to interest; and

2. For each component of the unpaid balance, the applicable rate of interest.

Gates can then compute the interest on each component to the date of this judgment. Gates did not present sufficient evidence at trial to calculate the interest.

### III. The Merits of Standard's Counterclaim

Standard claims the contract was exclusive and that it therefore should be awarded damages for sales Gates made to Standard's customers within the contract territory before the contract terminated. In defense, Gates argues that the contract is not exclusive and that Standard has not proven its damages.

■ The first issue is whether the contract is exclusive—whether Standard had the right to sell Gates' EPDM and Hypalon to the exclusion of other distributors and Gates itself. Standard has the burden to show that the contract was exclusive.

■ Standard concedes that the contract itself does not contain the word "exclusive" or otherwise expressly create an exclusive distributorship. Standard argues, however, that the contract is ambiguous and that therefore, the court may consider extrinsic evidence in determining the intent of

the parties regarding the exclusivity issue. Gates agrees that *if* the contract is ambiguous, extrinsic evidence may be considered.

Standard's ambiguity argument is supported by *Dialist Co. v. Pulford*, 42 Md. App. 173, 399 A.2d 1374 (1979). The *Dialist* court was also confronted with a distributorship contract that did not expressly create exclusive rights. It held that the combination of an assigned territory and the failure to specify whether the territory was exclusive rendered the contract ambiguous. *Id.* 399 A.2d at 1378 (following New York law). Applying *Dialist* here, the Gates–Standard contract is ambiguous.

■ The next issue is whether the extrinsic evidence surrounding the formation of and course of performance under the contract indicates the parties intended the contract to be exclusive.

Initially, the extrinsic evidence presented at trial helped remove the apparent contract ambiguity concerning exclusiveness. Both Gates and Standard's witnesses testified that the industry normally utilizes nonexclusive contracts. This norm suggests that a contract silent on the exclusivity issue should be treated as non-exclusive. Also, the contract territory included Wilmington, Delaware. This is the location of Gates' main office. That Gates would have agreed not to sell in a territory including its main office is unreasonable. Finally, Clapperton, President of Gates, explained that the contract territories were listed to correlate to locations where Standard had branch offices, sales offices or warehouses.

The parties' course of performance also supports a finding of non-exclusiveness. Standard sold roofing materials of other manufacturers that directly competed with Gates' EPDM and Hypalon. These materials were sold to contractors within the contract territory and before the contract terminated. Standard also sold Gates' roofing materials outside the contract territory, in locations where Gates had other distributors. Gates was aware of and tacitly approved of this conduct.

Gates contracted with Roofers Mart of Central Pennsylvania, Inc. to sell Gates' EPDM and Hypalon. The contract, dated November 25, 1987, was materially identical in language to the contract between Gates and Standard. Roofers Mart's contract listed several counties that were also included in Standard's contract. All the above described conduct by Gates and Standard is inconsistent with an understanding that the contract was exclusive.

Finally, the evidence concerning formation of the contract must be considered. Schab testified for Standard that prior to the execution of the contract, several employees of Gates suggested to him that the contract was exclusive. Gates' employees denied making these statements. In addition, McKelvogue of Standard, while professing a subjective understanding that the contract was exclusive, was unable to recall any specific conversation supporting this belief. Standard has not met its burden on this question of fact, and the evidence surrounding the formation of the contract supports a conclusion that the parties contemplated a non-exclusive contract.[2]

This case is materially different from *Dialist* and other cases Standard relies upon to argue exclusivity. In *Dialist* for example, the contract granted "the distributorship" to the distributor, and the manufacturer *admitted* that he promised that no one else could sell in the listed territory. By contrast, in this case, the contract appointed Standard as "an Independent Distributor," and Gates (the manufacturer) did not orally promise Standard exclusive rights.

As a matter of fact and of law, the contract between Gates and Standard was not exclusive. In light of this holding, it is not necessary to reach Gates' other argument concerning proof of damages.

## IV. Conclusion

An order in accordance with this Memorandum Opinion is attached.

**2.** Standard's briefing points to other evidence concerning formation and course of perform-ance it argues supports its position. This evidence is not particularly helpful to either party.

## ORDER

AND NOW, February 5, 1991, for the reasons stated in the attached Memorandum Opinion,

IT IS ORDERED THAT:

1.  Gates' claim for the unpaid balance of $60,408.61, with post-judgment interest, is GRANTED.
2.  Gates' claim for prejudgment interest is GRANTED in accordance with the prescribed computations in Section II. C., *supra.* Gates' counsel is granted 15 days to provide the court with a form of order stipulated to by opposing counsel.
3.  Standard's counterclaim is DENIED.